Kathleen **HOLMES**, Administrator of the Estate of Ernest J. Holmes, Deceased, Plaintiff,

v.

**SILVER CROSS HOSPITAL OF JOLIET, ILLINOIS**, a Body Corporate, et al., Defendants.

No. 71 C 2284.

United States District Court, N. D. Illinois, E. D.

Jan. 17, 1972.

---

Ken Jacobs, Villa Park, Ill., for plaintiff.

Tom L. Yates, Chicago, Ill., for defendant Baron.

Howard & French, Chicago, Ill., for defendant Silver Cross Hospital.

Thomas D. Allen, Wildman, Harrold, Allen & Dixon, Chicago Ill., for defendants Klafta and Bates.

## MEMORANDUM OPINION

WILL, District Judge.

This action under the Civil Rights Act, 42 U.S.C. § 1983, charges the defendants

with violating the civil rights of Ernest J. Holmes, deceased, by medically treating the decedent in a manner inconsistent with his religious beliefs while acting under color of State law. All defendants have moved to dismiss the complaint on various grounds.

The allegations of the complaint, which we must presume true for purposes of this motion to dismiss, present the following factual background. The decedent, a twenty year old married male, was involved in an accident on August 12, 1969 and was taken by ambulance to the defendant hospital. While he was fully conscious and competent, he informed the doctors of his religious convictions which precluded his following their medical advice that he accept blood transfusions. The doctors then attempted to persuade other members of his family, including his wife, brother, sister and parents, that such a transfusion was medically necessary. All the relatives refused on religious grounds and the plaintiff and decedent both signed a form releasing the defendants from liability if they were to perform corrective surgery and operations without any blood transfusions.

About four hours after his arrival at the hospital, the decedent lost consciousness and the defendants, for the purpose of forcing the unwanted blood transfusion upon the decedent in contravention of his religious beliefs, conspired to get the Will County, Illinois, probate court to declare the decedent incompetent as a minor and to appoint the defendant Baron as conservator for the decedent for the purpose of authorizing a blood transfusion. Baron was so appointed and authorized the blood transfusion and the doctors, at the express direction of the hospital, effected the transfusion knowing that their acts violated the decedent's religious convictions. In addition to the charged First Amendment violation, the plaintiff further asserts that the defendants conspired to deny the decedent and his family the statutorily required notice and hearing to determine whether he was a "neglected minor" or whether the blood transfusion was a medical necessity, thereby depriving the decedent of due process of law. No claim is asserted that the deprivation of any of these allegedly protected rights caused the death of the decedent. As each of the defendants moves to dismiss on a variety of grounds which overlap to some degree, we shall discuss each theory individually for the sake of clarity.

I

The initial issue presented is whether the applicable statute of limitations bars this action. We believe that this question is capable of easy resolution as the Seventh Circuit has specifically ruled that the limitations period for an action brought under 42 U.S.C. § 1983 in a district court in Illinois is five years. Wakat v. Harlib, 253 F.2d 59 (7th Cir. 1958). The Seventh Circuit there concluded that the limitations period for a Section 1983 action must be determined from state law, that such a suit was "a civil action not otherwise provided for" as relates to the Illinois statute of limitations, Ch. 83, Sec. 16, Ill.Rev.Stat., and that suit must, therefore, be brought within five years of accrual of the cause of action. See also, Contract Buyers League v. F. & F. Investment, 300 F. Supp. 210 (N.D.Ill.1969), aff'd *sub nom*, Baker v. F. & F. Investment, 420 F.2d 1191 (7th Cir. 1970), cert. denied 400 U.S. 821, 91 S.Ct. 40, 27 L.Ed.2d 49 (1970). Since this action was brought well within the five-year limitations period, the statute of limitations is no bar.

II

The second preliminary defense raised by several of the defendants is that the death of Ernest Holmes extinguishes whatever right to redress for the deprivation of his civil rights he may have possessed. Stated in other terms, this defense is that whatever right of action he had does not survive his death.

The question of whether a federal civil rights claim survives the death of the deprived individual, absent a clear Congressional enactment to that effect, was resolved by the Fifth Circuit more

than a decade ago. In Brazier v. Cherry, 293 F.2d 401 (5th Cir. 1961), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961), Judge John R. Brown in an excellent and thoughtful opinion held that, as a matter of statutory construction of 42 U.S.C. §§ 1983 and 1988, state law in relation to survival of actions must be ascertained and adopted as the law governing the issue of survival of a federal civil rights action in the absence of any specific Congressional enactment on the subject. We agree with his reading of the law and consider his opinion as controlling. See also, Pritchard v. Smith, 289 F.2d 153 (8th Cir. 1961); Galindo v. Brownall, 255 F.Supp. 930 (S.D.Cal.1966); Davis v. Johnson, 138 F.Supp. 572 (N.D.Ill.1955); Antieu, Federal Civil Rights Act, § 91, n. 5 and authorities cited therein.

We must, therefore, look to Illinois law concerning survival of actions. We note initially that if the action survives under state law, then the personal representative of the decedent may properly bring this suit, Ch. 83, Sec. 20, Ill. Rev.Stat. Section 339 of the Illinois Probate Act, Ch. 3, Sec. 339, Ill.Rev.Stat., provides that, in addition to the actions which survive by the common law, actions against officers for misfeasance, malfeasance, or nonfeasance also survive. While we can find no case law defining "state officers," we conclude that if the defendants were acting under color of state law as concerns the federal Civil Rights Act (discussed *infra,* Part V), then they were also acting as officers of the state as concerns Section 339 of the Probate Act. If, of course, they were not acting under color of state law, then they may not be deemed state officers and any action against them abated when the decedent died. This distinction is academic, however, because if the defendants were not acting under color of state law, the plaintiff has failed to state a valid cause of action under the federal Civil Rights Act. We conclude, therefore, that resolution of the issue of whether the action survives the death of the decedent is dependent upon resolution of the issue of whether the defendants acted under color of state law and that both issues must be answered in an identical manner.

## III

The next issue presented is whether the decedent's right to the free exercise of his religion guaranteed by the First Amendment has been infringed as a result of the defendants' forcing him to undergo a blood transfusion which they knew was against his religious principles. This issue has not been definitively settled by the Supreme Court of the United States or by our Court of Appeals. We must, therefore, review the leading cases on this subject from state and other federal courts as well as the decisions which relate generally to the free exercise clause of the First Amendment.

The few cases that have directly confronted the issue of the right of a Jehovah's Witness or a Christian Scientist to refuse state ordered medical treatment on religious principles are conflicting in result. See, In Re Brooks, 32 Ill.2d 361, 205 N.E.2d 435 (1965); John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 279 A.2d 670 (1971); Application of President and Directors of Georgetown College, Inc., 118 U.S.App. D.C. 80, 331 F.2d 1000 (1964), cert. denied, Jones v. President and Directors of Georgetown College, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); Winters v. Miller, 446 F.2d 65 (2d Cir. 1971), cert. denied, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971). We believe, however, that all these cases plus the leading case outlining the contours of the free exercise clause of the First Amendment, West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), agree that before the state may restrict a person's religious beliefs, it must proffer some substantial interest it claims to possess which must be protected even at the cost of restriction of the free exercise of religion by its citizens, i. e., the state must show that it is acting "to prevent grave and immediate danger to interests

which the state may lawfully protect." *Barnette, supra,* 319 U.S. at 639, 63 S.Ct. at 1186. A state's restriction on the free exercise of religion may not be upheld merely because some rational basis exists therefor; First Amendment rights do not rest on such slender grounds. *Winter v. Miller, supra,* 446 F.2d at 70. The cases make it clear that the test for determining whether a state-imposed restriction upon religious freedoms is valid is an *ad hoc* balancing test which examines the facts of each particular case, focusing upon the interests of the state and its citizens.

■■ In *Brooks, supra,* the Illinois Supreme Court ruled that even when approaching death has so weakened the mental and physical faculties of a theretofore competent adult without minor children that she may properly be said to be legally incompetent, she may not be compelled by a state appointed conservator to accept treatment of a nature which will probably save her life, but which is forbidden by her religious convictions and which she has steadfastly held even though aware that death may result from her refusal to accept such treatment. We believe that this balancing by Illinois' highest court of the state's interest versus the interest of protecting First Amendment freedoms deserves great deference. Although *Brooks* is not binding, we deem it persuasive and conclude that a state-appointed conservator's ordering of medical treatment for a person in violation of his religious beliefs, no matter how well intentioned the conservator may be, violates the First Amendment's freedom of exercise clause in the absence of some substantial state interest.

Various of the defendants assert that, even if *Brooks* is adopted as controlling law, it is nevertheless distinguishable from the instant situation because the plaintiff therein did not have minor children and the decedent herein had a wife and young child. Whether or not these factual differences are sufficient to remove this suit from the principle of *Brooks,* we presently do not have suffi-

cient information on the status of these dependents, whether their sole support came from the decedent, or whether the state court and conservator took these considerations into account in ordering the blood transfusions.

Certainly, if the conservator had no knowledge of these matters, the defendants cannot now assert them as an after-the-fact justification for the state-authorized actions since the state itself could have made no balance of its interests versus that of the decedent's constitutional rights. On the other hand, if the evidence ultimately discloses that these factors were considered, a balancing of all relevant state interests might justify the action taken.

■ However, on a motion to dismiss, as opposed to a motion for summary judgment or directed verdict, the sole issue is whether under the facts alleged in the plaintiff's complaint it appears to a certainty that the plaintiff is entitled to no relief. Accordingly, the motions to dismiss the complaint on the ground that the defendants did not deprive the decedent of any constitutionally protected right must be denied at this time. *Cf., Page v. Williams,* (7th Cir. 1971).

## IV

The defendant Baron contends that, even if he may be deemed to have deprived the decedent of constitutionally protected rights, he is nevertheless not liable for his actions because of the doctrine of judicial immunity. After reviewing the facts of this suit, we believe that he is correct and that he is entitled to the same immunity as the magistrate who appointed him.

■ The facts concerning the order appointing Baron as conservator appear from the order itself and from the complaint. The State's Attorney of Will County, Illinois, petitioned the Will County Probate Court for a conservator to be appointed for the decedent after he had lost consciousness (an incompetent is defined in Illinois, *inter alia,* as one incapable of managing his person because of

physical incapacity, Ch. 3, Sec. 112, Ill. Rev.Stat.). No notice was given to the decedent's family of this petition. The magistrate declared the decedent an incompetent and appointed Baron as his conservator, the appointment being "for the purpose of consenting to surgery, blood transfusions, medicine and drugs." The plaintiff makes no allegation or suggestion that Baron conspired in some manner with the defendant doctors or even knew them prior to his appointment. The decedent, whether rightfully or wrongfully, legally or illegally, had been declared an incompetent, had become a ward of the court, Proehl v. Leadley, 86 Ill.App.2d 472, 477, 230 N.E.2d 516, 519 (3rd Dist. 1967), and became subject to the powers of the conservator appointed by the court.

Baron was not appointed as a general conservator or as an estate conservator, but was specifically appointed for the sole purpose of consenting to surgery and blood transfusions. His order of appointment, thus, was made with specific directions as to his course of conduct as a conservator, giving him no discretion. His liability should be no greater or less than the judge who appointed him. We do not view his situation as any different than that of a United States Marshal ordered by this Court to remove demonstrators from the courthouse plaza in violation of their First Amendment rights. Certainly the Marshal's liability in damages to the demonstrators for his actions under direct order of the Court would have to depend on the liability, if any, of the Court. We must, therefore, determine the potential liability of the judge who appointed Baron to determine if the latter, as an agent of the court, subjected himself to any potential liability.

It is well settled that judges are immune from liability for damages for acts committed in their judicial capacity and within their judicial discretion even if accused of acting maliciously and corruptly. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967). Similarly, a state circuit judge and assistant state's attorney are immune from prosecution for damages because of their alleged violations of plaintiff's civil rights by acts performed in discharge of their official duties. Peckham v. Scanlon, 241 F.2d 761 (7th Cir. 1957).

Under this rule of law, the magistrate who appointed Baron as conservator for the purpose of consenting to blood transfusions is immune from suit even if he did it maliciously and with knowledge that the Illinois Supreme Court on direct review of such action has determined that it may violate the First Amendment's free exercise clause as respects a Jehovah's Witness.

We recognize that a judge may lose his immunity when he has acted totally outside of his jurisdiction. Wade v. Bethesda Hospital, 337 F.Supp. 671 (S.D.Ohio 1971); Lynch v. Johnson, 420 F.2d 818 (6th Cir. 1970). Cf., Bradley v. Fisher, 13 Wall. 335, 351, 80 U.S. 335, 351, 20 L.Ed. 646 (1871); Manning v. Ketcham, 58 F.2d 948 (6th Cir. 1932). There is, however, statutory authority in Illinois for the appointment of a conservator to protect the person of an incompetent, Ch. 3, Sec. 121, Ill.Rev.Stat., although there is no specific authority for requiring the incompetent to receive medical treatment. We believe, however, that even if he was erroneous in his judgment as to the full scope of his jurisdiction and even if he was acting maliciously, the judge who appointed Baron is immune from suit under the established doctrine of judicial immunity. Having reached this conclusion, we believe that Baron is likewise immune from suit and that his motion to dismiss must be granted.

### V

The remaining defendants, the hospital and the doctors who allegedly were the prime movers in compelling the decedent to accept a blood transfusion in violation of his religious beliefs, move to dismiss the complaint as to them on the ground that, even if they denied the decedent any constitutional right, they did not do so

under color of state law and thus are not liable for damages under the Civil Rights Act.

 Section 1983 of Title 42 of the United States Code does not purport to regulate purely private acts of discrimination or other denial of civil rights between individuals. The courts have long recognized, however, that state and private goals, functions, and activities may become so intertwined as to become indistinguishable. In these situations, actions for the deprivation of civil rights have been upheld since the alternative would allow states to circumvent the policies of Section 1983 by funneling funds and actions through private instrumentalities.

To prevent this occurrence, the Supreme Court has consistently imposed constitutional restraints in those instances in which the state has played an integral role in apparently private activity even when no allegation has been made that the state is affirmatively attempting to avoid the constitution. *See, e. g.,* Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). As the Court has stated: "Only by sifting facts and weighing circumstances can the non-obvious involvement of the State in private conduct be attributed its true significance." Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961). We must, therefore, with the above principles in mind, turn to the facts of the instant suit to determine if state action is involved.

A. *The hospital.* The defendant hospital is charged by the complaint with expressly directing the defendant doctors to carry out their activities wherein the decedent's religious beliefs were violated by the blood transfusion. The issue which we presently face is whether the hospital, which we presume so far as this motion is concerned to have acted in the manner asserted in the complaint, can be charged with acting under color of state law as that term is used in the Civil Rights Act.

The plaintiff contends that the hospital should be construed as being an arm of the state, at least for purposes of the First Amendment and 42 U.S.C. § 1983 because of state and federal tax exemptions it receives, because of receipt by the hospital of state and federal funds pursuant to an all-encompassing state plan for the care and treatment of all state citizens, because of exhaustive state regulation which governs in great detail the day-to-day operation of the hospital, and because the hospital is impressed with a public interest.

We note initially that certain of the contacts that the hospital has with the state may not be deemed sufficient by themselves to render acts of the hospital state action under the Fourteenth Amendment. Traditionally, private parties have not been deemed to be acting under color of law merely because they possess licenses, permits, charters or certificates from the states and/or their poitical subdivisions. Watkins v. Oaklawn Jockey Club, 86 F.Supp. 1006 (W.D.Ark.1949), aff'd 183 F.2d 440 (8th Cir. 1950); Rosee v. Board of Trade, 311 F.2d 524 (7th Cir. 1963), cert. denied 374 U.S. 806, 83 S.Ct. 1693, 10 L.Ed.2d 1031 (1963); Cotillion Club, Inc. v. Detroit Real Estate Board, 303 F.Supp. 850 (E.D.Mich.1964). Similarly, the receipt of a small amount of state or local funds has been held not to create state action. Powe v. Miles, 407 F.2d 73 (2d Cir. 1968), 32 A.L.R. 3d 846, although this result has been questioned. Antieau, Federal Civil Rights Acts § 36. Likewise, the mere receipt of tax exemptions from state and local governments has been held not to bring the concept of state action into play. Browns v. Mitchell, 409 F.2d 593 (10th Cir. 1969).

We note, however, that courts have concluded that when the private party is licensed by the state as well as being subjected to pervasive regulations concerning its operations, the actions of that private party are state actions so far as the Fourteenth Amendment is

concerned and under color of state law so far as 42 U.S.C. § 1983 is concerned. *See, e. g.,* Seidenberg v. McSorley's Old Ale House, Inc., 317 F.Supp. 593 (S.D.N.Y.1970), finding state action in the defendant's refusal to serve women in its bar through the state's licensing of the sale of alcoholic beverages and regulation of its licensees, and granting the plaintiff summary judgment in her Section 1983 suit. We need not, however, decide whether *McSorley's* review of the New York laws and regulations over purveyors of alcoholic beverages is a precedent for determining whether state action exists in the instant proceedings because private and charitable hospitals like the defendant have previously been deemed under an obviously similar theory to have acted as agents of the state so as to render them liable under the Fourteenth Amendment and 42 U.S.C. § 1983.

The landmark decision in the field of the relationship of private hospitals to state action under the Fourteenth Amendment is Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). In that case, the Court allowed injunctive relief against the defendant hospital, requiring it to end racial discrimination in determining who might use the facilities. The Court found that the participation by the hospital and the state in the Hill-Burton program, 42 U.S.C. § 291 et seq., a program which provides funds to states to be utilized for hospital facilities and which includes an elaborate and intricate pattern of state and federal regulation, constituted a sufficient intermingling of state and private functions so that the actions of the hospitals could be deemed as state actions. Even though the Hill-Burton funds were primarily federal in origin, the availability of the funds required the state to adopt an overall plan for state health care:

Upon joining the [Hill-Burton] program a participating State in effect assumes, as a State function, the obligation of planning for adequate hospital care. And it is, of course, clear that when a State function or responsibility is exercised, it matters not for the Fourteenth Amendment purposes that the institution actually chosen would otherwise be private: the [Fourteenth Amendment] guarantee applies. *Simkins, supra,* 323 F.2d at 968.

The Court went on to find that the hospitals involved therein, because of the Hill-Burton program generally and the financing received by the hospitals thereunder, "operate[d] as integral parts of comprehensive joint or intermeshing state and federal plans or programs designed to effect a proper allocation of available medical and hospital resources for the best possible promotion and maintenance of public health. Such involvement in discriminatory action 'it was the design of the Fourteenth Amendment to condemn.'" *Id.,* at 967.

We believe that the excellent analysis made in the *Simkins* decision of the Hill-Burton program and the state's administration and regulation of its overall hospital and health care program makes that decision persuasive authority. As Illinois has a similar system of pervasive regulation of hospitals and health-care facilities as had North Carolina in *Simkins, compare,* N.C.Gen. Stat. § 131–126.1 et seq. (1958) with Ill.Rev.Stat., Ch. 111½, Sec. 143 et seq. and Ch. 127, Sec. 55.26 (1969), we conclude that any action taken by the defendant hospital that deprives a person of constitutionally protected civil rights must be deemed as state action under the Fourteenth Amendment. Other cases reaching similar conclusions include: Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964); Smith v. Hampton Training School for Nurses, 360 F.2d 577 (4th Cir. 1966); Cypress v. Newport News General and Nonsectarian Hospital Association, 375 F.2d 648 (4th Cir. 1967); Meredith v. Allen County

War Memorial Hospital Commission, 397 F.2d 33 (6th Cir. 1968); Sams v. Ohio Valley General Hospital Association, 257 F.Supp. 369 (N.D.W.Va.1966). Because the "state action" required under the Fourteenth Amendment has consistently been equated with being "under color of law" under Section 1983, United States v. Price, 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), we further conclude that the defendant hospital is liable under the Civil Rights Act for any such constitutionally prohibited actions.

In Eaton v. Grubbs, *supra*, the Fourth Circuit extended the *Simkins* concept of state action to include hospitals that had not received any Hill-Burton funds, but which were nevertheless governed by the detailed state hospital regulations enacted in conjunction with the state's general participation in the Hill-Burton program. The Court further noted that the hospital had received significant tax exemptions, which, although they would not by themselves impose Fourteenth Amendment restrictions upon the recipients thereof, did "attain significance when viewed in combination with other attendant state involvements." *Eaton, supra,* 329 F.2d at 713. Although the plaintiff in this suit has not specifically alleged that the defendant hospital ever received any Hill-Burton funds, we nevertheless conclude on the basis of *Eaton* that this failure does not negate the state action concept which we have already found to exist and that the presumably private nature of the hospital is no defense to this Civil Rights Action brought against it. Of course, if the plaintiff can prove that the hospital has received Hill-Burton funds, this will further strengthen her claim that the hospital's actions were state action.

B. *The doctors.* The two doctor defendants contend that resolution of the state action issue as it relates to the hospital is immaterial as to them. This contention, however, is erroneous in that the complaint specifically charges the doctors with acting at the express direction of the hospital and as its agents. We must, therefore, determine (1) if the doctor defendants can be said to have been involved with state action as agents of the hospital and (2) if they can be charged with being involved with state action apart from any action consummated in joint participation with an agent of the state.

We believe that the initial issue is easily resolved once we have determined that the hospital may be deemed to have been involved in state action. If they acted as agents of the entity charged with state action, the doctors clearly must take upon their shoulders all the responsibilities that their principal possesses, particularly when, as here, the principal is incapable of executing any action whatsoever except through the use of agents. Under this theory, therefore, the doctors act under color of law so far as Section 1983 is concerned whenever they act under the express direction and as agents of the hospital. When they are so acting, they are bound by the same constitutional restraints that are upon the hospital. If, however, they act as private physicians who merely utilize the facilities of the hospital but who do not act at the behest of the hospital, whatever decisions or actions they take, irrespective of any constitutional deprivation that may accrue thereby, they would not then be acting under color of state law. The doctors contend that, contrary to the allegations of the complaint, as concerns the happenings involved in this litigation, they were merely acting as private physicians and not at the express direction of the hospital or as its agents. This contention, however, is presently immaterial because we must presume the assertions in the complaint to be true that such relationship in fact did exist.

The theory that the agent, who otherwise might be deemed a private party but for his agency relationship, becomes

a party acting under color of law is not novel. It has long been held that private parties also act under color of law when they directly assist the admitted state agency in carrying out the unlawful action and that they therefore become subject to the sanctions of Section 1983. Baldwin v. Morgan, 251 F.2d 780 (5th Cir. 1958). Similarly, private persons can be said to be acting under color of law when, pursuant to a contract, they carry out the functions of the state agency that is the other party to the contract. Kissinger v. New York City Transit Authority, 274 F.Supp. 438 (S.D.N.Y.1967). Likewise, private persons who would not be operating under color of law if acting alone are covered by Section 1983 if they conspire, as the defendant doctors are here charged, with parties whose actions are deemed to be state action and consummate the constitutional deprivation that was the object of the conspiracy, notwithstanding that Section 1983 does not by its terms prohibit conspiracies as does 42 U.S.C. § 1985. Nesmith v. Alford, 318 F.2d 110 (5th Cir. 1963), cert. denied 375 U.S. 975, 84 S.Ct. 489, 11 L.Ed.2d 420 (1964); Cohen v. Norris, 300 F.2d 94 (9th Cir. 1962); Hoffman v. Halden, 268 F.2d 280 (9th Cir. 1959); Baldwin v. Morgan, *supra;* Gomez v. Florida State Employment Service, 417 F.2d 569 (5th Cir. 1969); 2 Emerson Haber & Dorsen, Political and Civil Rights in the United States, 1448 (3rd Ed. 1967); *Cf.,* United States v. Price, *supra,* wherein it was held that any person acting in concert, i. e., as "a willful participant in joint activity," with parties whose conduct was deemed to be state action is chargeable with acting under color of law for purposes of 18 U.S.C. § 242, the criminal counterpart to 42 U.S.C. § 1983. Both statutes have been construed similarly in their reach of acts deemed to be under color of state authority. *Price, supra,* 383 U.S. at 794, n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267; Monroe v. Pape, 365 U.S. 167, 185, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *See,*

*also,* this Court's opinion in Huey v. Barloga, 277 F.Supp. 864, 873 (N.D.Ill. 1967).

In support of their argument that they did not act under color of law, the doctors cite several cases wherein doctors who have signed the petitions and/or physician certificates needed to commence statutory commitment proceedings for persons alleged to be mentally incompetent have been held to have been acting as private citizens and not under color of law so as to allow suit under Section 1983. Duzynski v. Nosal, 324 F.2d 924 (7th Cir. 1963); Byrne v. Kysar, 347 F.2d 734 (7th Cir. 1965). Our agreement with these decisions is evidenced by this Court's unpublished ruling in Baskin v. Baskin, No. 64 C 1160 (N.D.Ill. May 28, 1965), wherein we reached the same conclusion. We do not, however, believe these decisions dispositive of the issues before us because the complaint does not charge the doctors with having acted in their individual capacity but, rather, as agents or joint participants with an entity deemed to be acting under color of state law. In *Duzynski,* for example, the doctor who was found not to have acted under color of law had certified to the plaintiff's mental illness but was not charged with having been an agent of or joint participant with a party that was found to be acting under color of law. The fact that he was an employee of a public hospital was immaterial to the case because the hospital itself was not charged with any responsibility for the doctor's actions other than as being his employer. If it can ultimately be shown that the doctors herein did not act in joint participation with any agent of the state, the *Duzynski* line of cases will be controlling and the doctors will be deemed, at most, to be private actors conspiring amongst themselves to deprive the decedent of his First Amendment rights who, therefore, may not be sued under 42 U.S.C. § 1893. But for purposes of the present motions, we conclude that the complaint does state a

valid cause of action against the defendant doctors and that their motions to dismiss, therefore, must be denied.

## VI

In summary, we are faced with a complaint that charges the hospital, doctors, and court-appointed conservator with conspiring to effectuate a plan under color of state law wherein the plaintiff's husband was refused medical treatment in accordance with his religious views and coerced into accepting a blood transfusion in violation of his religious beliefs through a scheme whereby the defendants, after being refused the right to give the decedent blood transfusions by the decedent, his wife and parents, waited until he had lost consciousness and then proceeded to obtain, without notice to any other interested party, a decree of incompetency from the Circuit Court of Will County coupled with the appointment of a conservator for purposes of approving the blood transfusion. The defendant, having moved for dismissal of the action on various grounds, we conclude that: (1) this action was filed within the applicable five year statute of limitations; (2) the action survives the death of the decedent; (3) so far as concerns a motion to dismiss, the complaint adequately alleges a deprivation of a constitutionally protected right; (4) the defendant Baron shares the immunity possessed by the Probate Court magistrate who appointed him and is thus immune from suit; (5) the alleged actions of the hospital must be deemed as state action under the Fourteenth Amendment and under color of law under 42 U.S.C. § 1983; and (6) the alleged actions of the doctors as agents of and joint participants with an acknowledged state agent render them also liable under 42 U.S.C. § 1983. Accordingly, the motion to dismiss of the defendant Baron will be granted and the motions to dismiss of the defendant hospital and doctors will be denied.

An appropriate order will enter.