**In re Lucille BOYD, Appellant.**

Nos. 12962, 13045.

District of Columbia Court of Appeals.

Argued March 20, 1979.

Decided June 21, 1979.

A. Franklin Burgess, Jr., Public Defender Service, for appellant.

Constantine J. Gekas, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Oscar Altshuler, and Richard W. Goldman, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before NEWMAN, Chief Judge, and KELLY and FERREN, Associate Judges.

FERREN, Associate Judge:

This appeal presents one question: whether—in a nonemergency situation—the court may authorize a hospital to administer psychotropic drugs to a patient adjudicated mentally ill and incompetent, when that patient, before her illness and incompetency, had rejected any use of medication on religious grounds. Because it appears that the trial court did not give sufficient consideration to appellant's religious views as a Christian Scientist, we remand to permit the court to determine, to the extent possible, the course of action appellant herself would choose if she were capable of making a competent decision. If the court decides that appellant would reject psychotropic medication on religious grounds, it must deny the hospital authority to use such treatment unless the District can show a compelling reason for overriding her putative wishes.

## I.

On March 16, 1977, appellant Lucille Boyd was admitted to Saint Elizabeths Hospital pursuant to an application for emergency hospitalization. D.C.Code 1973, § 21–522. Her son had taken her to the hospital because she had been acting in an irrational and sometimes threatening manner during the previous few weeks. At the time of her admission, Mrs. Boyd, age 67, had been a practicing Christian Scientist for nearly two years, had rejected the use of medication, and had also encouraged her son to do so.[1] Although she was acting somewhat irrationally at the time, she made it clear to the hospital staff that she was a Christian Scientist and for that reason would not accept medical treatment.[2]

Tests performed on blood drawn from Mrs. Boyd disclosed that she had a mild case of diabetes and a positive serology, indicating that she was, or had been, suffering from syphillis. In addition, from the time of admission Mrs. Boyd was frequently irrational or incoherent, had delusions of persecution and grandiosity, and suffered from auditory hallucinations. She presented a

---

1. Prior to becoming a Christian Scientist, Mrs. Boyd had been an active member of a Pentecostal Church. She became involved in Christian Science in 1975 after experiencing considerable difficulty recuperating from a hysterectomy. From 1975 until her admission to Saint Elizabeths in 1977, Mrs. Boyd met with a Christian Science practitioner once a month and conferred with her almost daily by telephone. During this period, she also attended a Christian Science church regularly. After becoming involved with Christian Science, Mrs. Boyd stopped complaining about her illness and informed her son that she was cured, did not believe in medication, and would not accept it because of her religious beliefs. A month or two before her admission to Saint Elizabeths, Mrs. Boyd's religion took on aspects which, according to testimony by her Christian Science practitioner, were not attributable to that religion. Mrs. Boyd's landlady described some of her religious behavior at that time as engaging in voodoo.

2. Because Mrs. Boyd refused medication when admitted to the hospital, two hospital chaplains conducted a 45 minute interview with her to determine her religious faith. They concluded that appellant was, in fact, a Christian Scientist.

management problem to the hospital staff. On some occasions, she was verbally and physically assaultive, and, at other times, she became withdrawn or catatonic, standing for hours in the same position without relaxing. She also refused to eat for three months, requiring forced tube feeding.

On the basis of information obtained from her blood tests and Mrs. Boyd's actions in the hospital, her doctors concluded that she was suffering "from schizophrenia, or from an organic brain syndrome due to neurosyphillis or to any of the degenerative diseases of the brain associated with old age." They proposed treating her with penicillin, a very effective cure for neurosyphillis, and with psychotropic drugs, which could tranquilize her and help reduce the level of auditory hallucinations that troubled her. Appellant, however, continued to refuse medication.

Because the doctors believed that Mrs. Boyd was unable to comprehend the nature of her illness or the anticipated benefits of the proposed treatment plan, the hospital petitioned the Superior Court for authorization to conduct tests on appellant and administer medication.[3] Judge Taylor convened a competency hearing on July 18, 1977, to decide whether to order medical treatment if an emergency were to arise. On the same day, the court received into evidence the final report of the Commission on Mental Health, which concluded that appellant was mentally ill and likely to injure herself or others.[4] On July 21, 1977,

Judge Taylor entered a written order stating that appellant was "incompetent to understand the nature of the decision she is being asked to reach concerning both medical and mental proposed treatment." He added that she was unable to assist the court, Christian Science practitioners, or her doctors, lawyer, or family in developing a treatment plan. The court, nonetheless, refused to grant the hospital's petition for authorization to administer medication, stating that such an order would be "premature" and should be held in abeyance until after a jury trial on civil commitment (or an earlier emergency requiring immediate treatment).

On November 17, 1977, a jury trial on civil commitment began before Judge Kessler. Four days later, the jury returned its verdict, concluding that Mrs. Boyd was mentally ill and, because of her illness, likely to injure herself or others if permitted to remain at liberty. Judge Kessler held three dispositional hearings during the next two months to determine the most appropriate placement and treatment of Mrs. Boyd. After the first, Judge Kessler reaffirmed Judge Taylor's conclusion that Mrs. Boyd was incompetent.[5] The second and third hearings were substantially devoted to Mrs. Boyd's religious history, including the possibility that she be committed to a Christian Science institution, the Ten Acres Foundation. Plans for placement in that facility were abandoned, however, because it only

---

3. The hospital's petition was not filed pursuant to any statute providing for the adjudication of incompetency of mentally ill individuals. See D.C.Code 1973, §§ 21–1501, –1507 (providing for appointment of conservators for the mentally ill). Instead, the hospital asserted that, under Super.Ct.Civ.R. 3 and 8(f), the court had inherent equity powers to find appellant incompetent to make a treatment decision and to order that she receive medical treatment. Appellant did not contest the jurisdiction of the court, the appropriateness of the proceeding, or the finding of incompetency.

4. The Commission action was initiated a few days after Mrs. Boyd's admission to Saint Elizabeths, when the hospital filed a petition for civil commitment pursuant to D.C.Code 1973, § 21–541.

5. Civil commitment to Saint Elizabeths under D.C.Code 1973, § 21–545 demonstrates only that a committee is mentally ill and likely to injure herself or others. It does not, at the same time, mean, that the committee is legally incompetent. See Cameron v. Mullen, 128 U.S. App.D.C. 235, 244 n. 29, 387 F.2d 193, 202 n. 29 (1967); D.C.Code 1973, § 21–564. Thus, even after a civil commitment proceeding, a trial court cannot override the treatment decision of a mentally ill adult unless he or she has been adjudicated presently incompetent. See Canterbury v. Spence, 150 U.S.App.D.C. 263, 271, 464 F.2d 772, 780, cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972) (all competent persons have the right to refuse medical treatment).

would admit patients who were under the active care of a Christian Science practitioner, and a practitioner could not be found whom Mrs. Boyd, by that time, would accept. Finally, on January 20, 1978, after the third dispositional hearing, Judge Kessler committed Mrs. Boyd to Saint Elizabeths indefinitely, ordering that she "undergo whatever treatment St. Elizabeths deems appropriate."[6] Appellant then noted this appeal.[7]

Initially, the hospital treated appellant with both penicillin and psychotropic drugs, but it has since ended its use of penicillin and is now administering only the psychotropic drugs. On this appeal, therefore, appellant contests only the forced administration of psychotropic drugs.

## II.

■ A. We consider the question whether, in the absence of a life-or-death situation, a court may order a legally incompetent individual to receive psychotropic drugs when that individual, while competent, had rejected all use of medical treatment on religious grounds.[8]

The parties agree that a competent individual has a First Amendment religious right to refuse medical treatment unless the state can demonstrate a compelling interest that would justify overriding the individual's choice. *In re Osborne*, D.C.App., 294 A.2d 372, 374 (1972); *Winters v. Miller*, 446 F.2d 65, 68–69 (2d Cir.), *cert. denied*, 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *Holmes v. Silver Cross Hospital*, 340 F.Supp. 125, 129–30 (N.D.Ill.1972); *In re Quinlan*, 70 N.J. 10, 36, 355 A.2d 647, 661, *cert. denied*, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976); *cf. In re Brooks*, 32 Ill.2d 361, 372–73, 205 N.E.2d 435, 441–43 (1965) (state can impose treatment if it meets a "clear and present danger" test).[9]

---

**6.** Judge Kessler granted a ten day stay of her order to permit appellant to make an expedited appeal. Appellant filed a motion for a stay pending appeal in this court on January 26, 1978. On the same day, this court *sua sponte* granted a temporary stay. On March 3, after appellee had filed its opposition to the stay, this court denied the motion for a stay and terminated the temporary stay.

**7.** In this appeal, Mrs. Boyd does not challenge the rulings that she is incompetent or the jury verdict that she is mentally ill and a danger to herself or others.

**8.** Appellant also bases her right to refuse medical treatment on several other grounds. Initially, she suggests that she has a right, based on the common law tort doctrine of informed consent, to reject medical treatment. We disagree. It is true that every competent adult has the " 'right to determine what shall be done with his own body.' " *Canterbury v. Spence, supra*, 150 U.S.App.D.C. at 271, 464 F.2d at 780 (citation omitted); *see Developments in the Law—Civil Commitment of the Mentally Ill*, 87 Harv. L.Rev. 1190, 1194 (1974) (hereafter "Developments"); *accord, Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 424 (1977). But once an individual becomes incompetent, the state must act as *parens patriae*. As such, it has the duty and the right to care for the "best interest" of the incompetent, even if that occasionally means overriding a decision made by the individual while incompetent. *See Application of President and Directors of Georgetown College, Inc.*, 118 U.S.App.D.C. 80, 88, 331 F.2d 1000, 1008,

*cert. denied*, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); *Saikewicz, supra*, 373 Mass. at ——, 370 N.E.2d at 427; Cantor, *A Patient's Decision to Decline Lifesaving Medical Treatment: Bodily Integrity vs. The Preservation of Life*, 26 Rutgers L.Rev. 228, 230–31 (1973).

Next, appellant suggests two nonreligious constitutional bases for her right to refuse treatment. She argues, first, that a constitutional right to privacy protects both competent and incompetent individuals from receiving treatment against their will. *See Saikewicz, supra* at ——, 370 N.E.2d at 424; *Quinlan, supra*, 70 N.J. at 38–42, 355 A.2d at 662–64; *Developments, supra* at 1194–95, 1195 n. 12; *cf. Roe v. Wade*, 410 U.S. 113, 152–53, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut*, 381 U.S. 479, 485–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Second, she maintains that she has a First Amendment right to the integrity of her mental processes, which would be infringed by the unauthorized administration of drugs that "tinkered" with those mental processes. *See Mackey v. Procunier*, 477 F.2d 877, 878 (9th Cir. 1973); *Scott v. Plante*, 532 F.2d 939, 946 (3d Cir. 1976). In light of our decision on appellant's First Amendment right to free exercise of her religion, we need not consider these arguments.

**9.** "As distilled from the cases, the State has claimed [an] interest in: (1) the preservation of life; (2) the protection of the interests of innocent third parties [e. g., minor children]; (3) the prevention of suicide; and (4) maintaining the ethical integrity of the medical profession."

This court, in fact, has held that even in a life-or-death situation, the government cannot force unwanted medical treatment on a competent individual who has made an informed decision to reject such treatment on religious grounds. *In re Osborne, supra* at 374–75. The crucial question, therefore, is how an individual's *incompetence* affects the exercise of First Amendment rights.

The government contends, and it appears the trial court decided, that because no one can be certain of the choice an incompetent individual would make if competent and faced with a treatment decision, the court— representing the state as *parens patriae, see* note 8 *supra*—must decide what *it* deems to be in the best interest of the individual. In this situation, it is said, the individual's religious opposition to medical treatment, although made when competent, should not control the court's decision.

Appellant asserts, to the contrary, that her First Amendment right to refuse treatment survives an adjudication of incompetency. She contends that the court, in deciding whether to force medical treatment on an unwilling incompetent, should apply the "substituted judgment" rule; *i. e.,* the court should attempt to ascertain, as nearly as possible, the choice which that individual would make if competent.[10] It follows, according to appellant, that if an individual has clearly expressed a religious objection to medical treatment immediately prior to incompetency, that objection must control the trial court's decision.

B. There is no decisive line of authority. In life-or-death situations, this court and others have held that the request of a competent and lucid Jehovah's Witness not to receive a blood transfusion must be honored on First Amendment grounds. *Osborne, supra; Holmes, supra; Brooks, supra.* In other emergency situations, however, where a Jehovah's Witness was not lucid at the time the decision had to be made, courts have authorized a blood transfusion over the objection of relatives, stressing the state's responsibility, as *Parens patriae,* to save life. *See Application of President and Directors of Georgetown College, Inc.,* 118 U.S.App. D.C. 80, 331 F.2d 1000, *cert. denied,* 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); *John F. Kennedy Memorial Hospital v. Heston,* 58 N.J. 576, 279 A.2d 670 (1971).

In *Osborne, supra,* we highlighted this distinction based on competence at the critical moment. Although we held that the trial court must honor an individual's religious desire not to receive medical care if he or she is competent, we also indicated, in dicta, that where the person is not lucid or competent, his or her views may not be controlling. We suggested that

> [when] the patient is comatose, or suffering impairment of capacity for choice, it may be better to give weight to the known instinct for survival which can, in a critical situation, alter previously held convictions. In such cases it cannot be determined with certainty that a deliberate and intelligent choice has been made. [*Id.* at 374–75.]

*Saikewicz, supra,* 373 Mass. at ——, 370 N.E.2d at 425.

10. The "substituted judgment" concept originated in England in cases involving the disposition of estates of incompetents. *See Strunk v. Strunk,* 445 S.W.2d 145, 147–48 (Ky.1969); *Saikewicz, supra,* 373 Mass. at ——, 370 N.E.2d 417, 431 (1977). The doctrine was first used to authorize a gift from the estate of an incompetent person to an individual to whom the incompetent owed *no duty of support. Saikewicz, supra,* 373 Mass. at ——, 370 F.2d at 431. In such cases, the courts decided that they had the power to deal with the incompetent's estate in the same way that the incompetent would if he or she were capable of making a rational decision. *Strunk, supra* at 147; *Saikewicz, supra,* 373 Mass. at ——, 370 N.E.2d at 431. In

the United States, the doctrine has been applied to a case authorizing an organ transplant from an incompetent to a sibling. *Strunk, supra. But see Lausier v. Pescinski,* 67 Wis.2d 4, 226 N.W.2d 180 (1975). It has also been used to justify nonemergency surgical procedures designed to benefit the incompetent. *In re Weberlist,* 79 Misc.2d 753, 360 N.Y.S.2d 783 (1974). In summary, courts have used a subjective, substituted judgment test to determine the putative wish of the incompetent and carry out the state's *parens patriae* responsibility for determining the best interest of the incompetent. *See generally* Robertson, *Organ Donations by Incompetents and the Substituted Judgment Doctrine,* 76 Colum.L.Rev. 48, 57–68 (1976).

In Mrs. Boyd's case, of course, the emergency factor is not present; no one suggests that psychotropic drugs are necessary to save her life. Instead, the hospital proposes to use these drugs only to tranquilize her, lessen the volume of her auditory hallucinations, and stabilize her condition to the point where she can become more receptive to other treatment. Thus, the sense of urgency that sometimes may compel a court to override religious convictions is simply not in this case. Nonetheless, we do consider here a patient in the second category recognized by our *Osborne* dicta: one who suffers "impairment of capacity for choice." Thus, our question, more precisely, is this: when a legally incompetent patient asserts a First Amendment right not to receive psychotropic drugs, and those drugs are not needed to save the patient's life, how does the trial court decide whether to authorize that medication?

We begin by acknowledging two premises: the traditional rule against imposing medical treatment on a competent person who rejects it, for whatever reason—absent a compelling state interest, *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 271, 464 F.2d 772, 780, *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), and the traditional deference given the First Amendment right to the free exercise of religion. *See Osborne, supra.* Implicit here is the recognition that competent persons occasionally decide that their best interest requires rejection of medical care on religious grounds, and that courts should respect their wishes. Accordingly, it begs the question to say that the trial court can determine an incompetent's "best interest" without considering that person's religious opposition to medical treatment. As the Jehovah's Witness cases make clear, even in a life-or-death situation one's religion can dictate a "best interest" antithetical to getting well. The question, then, becomes: how

does a court factor in the religious preference of an incompetent in determining his or her "best interest"?

As appellant has pointed out, in nonemergency situations a number of courts have adopted the "substituted judgment" approach. The court, as surrogate for the incompetent, is to determine as best it can what choice that individual, if competent, would make with respect to medical procedures. *See* note 10 *supra.* We believe this approach is sound, whether religious preference or other factors are involved, for it is the only way to pay full respect to the individuality and dignity of a person who has expressed clear, deeply felt, even sacred preferences while competent, but no longer has the capacity to decide. The Supreme Judicial Court of Massachusetts recently developed this rationale in *Superintendent of Belchertown State School v. Saikewicz,* 373 Mass. ——, ——, 370 N.E.2d 417, 428 (1977):

The "best interests" of an incompetent person are not necessarily served by imposing on such persons results not mandated as to competent persons similarly situated. It does not advance the interest of the State or the ward to treat the ward as a person of lesser status or dignity than others. . . . Nor do statistical factors indicating that a majority of competent persons similarly situated choose treatment resolve the issue. The significant decisions of life are more complex than statistical determinations. Individual choice is determined not by the vote of the majority but by the complexities of the singular situation viewed from the unique perspective of the person called on to make the decision. To presume that the incompetent person must always be subjected to what many rational and intelligent persons may decline is to downgrade the status of the incompetent person by placing a lesser value on his intrinsic human worth and vitality.[11]

**11.** One commentator, speaking in the context of organ donations by incompetents, has explained the rationale behind the substituted judgment approach as follows:

[M]aintaining the integrity of the person means that we act toward him "as we have

reason to believe he would choose for himself if he were capable of reason and deciding rationally." It does not provide a license to impute to him preferences he never had or to ignore previous preferences. . . . If preferences are unknown, we must act with

Obviously, in attempting to make such a subjective evaluation, in contrast with an objective, "reasonable person" analysis, the court will be engaging, at best, in approximation; any imputation of a preference to an incompetent person will, to some extent, be fictional. But that inherent limitation does not make the "substituted judgment" analysis less valid than one which purports to be wholly objective, for *any* analysis presupposes the court's judgment as to what a human being would decide for oneself under the circumstances. There is no reason to believe that the court's use of a hypothetical, reasonable person as the model for its decision is preferable to an approach which attempts, however imperfectly, to account for the particular qualities of mind and preference known about the individual before the court. *See* note 11 *supra*.

■ With this said, we should underscore that inevitably the substituted judgment approach, because of its obvious limitations, will result in a synthesis of (1) factors known to be true about the incompetent and (2) other considerations which necessarily suggest themselves when the court cannot be sure about an incompetent's actual wishes. Thus, in trying to decide what choice the individual would make if competent, the court is not precluded from filling the gaps in its knowledge about the incompetent by taking into account what most persons are likely to do in a similar situation. *See Saikewicz, supra,* 373 Mass. at ——, 370 N.E.2d at 430; note 11 *supra*.

■ C. We turn now, in greater detail, to how the court should construct the "substituted judgment" synthesis, particularly as it attempts to account for religious views. With respect to a situation in which an individual's life itself is not at stake, we conclude that (a) when an individual, prior to incompetence, has objected, absolutely, to medical care on religious grounds, (b) the evidence demonstrates a strong adherence to the tenets of that faith, and (c) there is no countervailing evidence of vacillation, the court should conclude that the individual would reject medical treatment. Byrn, *Compulsory Lifesaving Treatment for Competent Adults,* 44 Fordham L.Rev. 1, 26 (1975); *accord, State Department of Human Services v. Northern,* 563 S.W.2d 197, 213 (Tenn.App.1978) (Drowata, J., concurring); *see Holmes, supra; Brooks, supra;* Robertson, supra; *Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L.Rev. 1190, 1218–19, 1218 n.94 & 95 (1974).[12] In other, less clear situations, the court should make the putative decision by looking at the nature, intensity, and longevity of the patient's objection to medical care, the intrusiveness and side effects of the proposed treatment, and the likelihood of cure or improvement with or without such treatment. *See* Byrn, *supra* at 26.

respect to the preferences as a reasonable, competent person in the incompetent's situation would have . . . . For such an attempt would continue to regard him, even during his incapacity, as an individual with free choice and moral dignity, and not as someone whose preferences no longer mattered. Even if we were mistaken in ascertaining his preferences the person [if he later became competent] could still agree that he had been fairly treated if we had a good reason for thinking he would have made the choices imputed to him. [Robertson, *supra* at 63 (quoting J. Rawls, A Theory of Justice 209 (1971)).]

12. One commentator has explained:
Since a religiously motivated decision to refuse treatment in the future is based on moral values which do not depend on an accurate assessment of empirical possibilities, that decision would seem unlikely to change when the individual actually becomes

ill. The state as *parens patriae* should therefore respect that decision. In contrast to this situation, a decision based on an evaluation of the desirability of treatment for an illness that might be contracted in the future does depend on the accuracy of the individual's forecast of future circumstances and his future preferences. When his circumstances have changed so dramatically that it is probable that he did not fully evaluate the situation in which he now finds himself, the factors which require respect for his treatment decision would not seem to be present. Nevertheless, the difficulty of determining what the individual did consider when he made his decision and the possibility that the argument discussed here could, if broadly applied, justify overriding any prior treatment decision, suggest that prior decisions to refuse treatment should generally be respected. [*Developments, supra* at 1218 n.95].

More specifically, as to the previously-expressed objection itself, several factors are important: whether the objection, if religious, is a recognizable, established one, such as the well-known views of a Jehovah's Witness or Christian Scientist; whether the individual has acted upon these views in ways that demonstrate they have been deeply felt; and whether these views have been long held, perhaps as a matter of family tradition, or if more recently adopted, have been the result of demonstrable experience, such as a religious conversion, which would justify a court's conclusion that the views are unequivocal.

Second, the possibility of detrimental side effects may be especially relevant in a case, such as this, concerning psychotropic drugs. Materials filed with the trial court indicate that such medication may produce side effects which commonly motivate even competent patients to reject their use on nonreligious, as well as religious, grounds. *See Rennie v. Klein*, 462 F.Supp. 1131 (D.N.J. 1978).[13]

Third, the likelihood of cure or improvement with or without treatment is likely to have a bearing on one's decision. It may be, as we stated in *Osborne, supra* at 374, that absent a conviction as strong as Mr. Osborne's when life is threatened and can only be saved with prompt medical assistance, one's "instinct for survival" may overtake a lifelong conviction that medical care is wrong. But when life cannot be saved—when death is not far off in any event—a patient may be less likely to accept treatment merely to prolong life, *see Quinlan, supra*, especially when the treatment is likely to cause severe pain. *See Saikewicz, supra*. It follows that where the prospect of imminent death is a marginal or nonexistent factor, as in Mrs. Boyd's case, there may be even less incentive for one to compromise religious or other principles to accept medication.

■ D. We turn now to the present case. At the dispositional hearings, the trial court took extensive testimony on Mrs. Boyd's religious history and preferences, to the point of facilitating every effort to have Mrs. Boyd accepted by a Christian Science institution, the Ten Acres Foundation. However, because the record does not contain specific findings, we cannot say that the court used the "substituted judgment" approach. It is unclear, for example, why, absent a life-or-death situation—and absent behavior by Mrs. Boyd of such danger to other persons that sedation became necessary, *see Rennie, supra* at 1145—the court gave authority for "whatever treatment St. Elizabeths deems appropriate." On balance, therefore, it does not appear that the court gave sufficient consideration, under the "substituted judgment" concept, to Mrs. Boyd's previously expressed religious views. Accordingly, we must remand this case for reconsideration.

■ On remand, the court should consider, first, whether appellant is currently incompetent. If she is, then the court should inquire whether the hospital still

---

**13.** Several cases and law review articles have considered the benefits and side effects of psychotropic medication. Psychotropic drugs are considered more effective than any other form of treatment in reducing thought disorder in schizophrenics. *Rennie, supra* at 1137; *see* Plotkin, *Limiting the Therapeutic Orgy: Mental Patient's Right to Refuse Treatment*, 72 N.W.L. Rev. 461, 474 (1977). Furthermore, they are sometimes important in aiding patients to participate in and benefit from such other types of treatment as individual or group psychotherapy and occupational therapy. *Rennie, supra* at 1137.

The drugs have a number of unpleasant side effects, however. Among the short-term side effects commonly reported are: blurred vision, dry mouth and throat, constipation, diarrhea, low blood pressure, dizziness, faintness, drowsiness, slowing of the thought processes, apathy, weight gain, loss of sexual desire, depression, akathesia (inability to stay still, restlessness, agitation), and Parkinsonisms (mask-like face, drooling, muscle stiffness, rigidity, shuffling gait, tremors). In rare cases, skin rashes and sudden death may result. A possible permanent side effect is tardive dyskinesia, characterized by involuntary movements of the tongue, face, mouth, lips, or jaw. Additionally, ulcerations of the mouth may occur, speech may become incomprehensible, and, in extreme situations, swallowing and breathing may become difficult. The risk of this disorder is greatest among elderly female patients. *See Scott, supra* at 945 n.8 (3d Cir. 1976); *Rennie, supra* at 1137–38; Plotkin, *supra* at 475–79.

seeks authorization for psychotropic medication. If it does, the court should then take the "substituted judgment" approach by attempting to determine what course of action Mrs. Boyd would choose now.[14] If the court decides that Mrs. Boyd would reject psychotropic drugs on religious grounds if presently competent and fully aware of her situation, it must refuse to authorize such treatment unless the government can demonstrate that a particular, "compelling state interest" would justify overriding Mrs. Boyd's putative choice. *Osborne, supra* at 374; *accord, Georgetown*

College, supra, 118 U.S.App.D.C. at 87–90, 331 F.2d at 1007–10; *Holmes, supra* at 130; *Brooks, supra,* 32 Ill.2d at 372–73, 205 N.E.2d at 441–42; *Heston, supra,* 58 N.J. at 580–85, 279 A.2d at 672–74. *See Saikewicz, supra* 373 Mass. at ——, 370 N.E.2d at 424–27.[15]

*Remanded for further proceedings.*

14. Throughout this proceeding, Mrs. Boyd has been strongly opposed to taking any medication and was fully aware that she was being forced to accept psychotropic drugs against her will. For example, after hearing the court's order that she be committed to Saint Elizabeths for whatever treatment or medication the hospital deemed appropriate, Mrs. Boyd responded, "You know god-damn well I'm not taking no god-damn treatment. You brought me down here today for nothing."

After oral argument, the hospital submitted to this court a "Suggestion of Mootness, or in the Alternative, Motion for Remand." It explained that Mrs. Boyd's attending psychiatrist had informed the trial court that there has been "considerable improvement" in her mental condition and that Mrs. Boyd "gives no religious objection to taking her medication at this time, and accepts the medication voluntarily."

The hospital bears a heavy burden in proving that this case is now moot. *See County of Los Angeles v. Davis,* —— U.S. ——, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979); *United States v. Concentrated Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968); *United States v. W. T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 97 L.Ed. 1303 (1953). In this case, the doctor's unverified letter to the trial court fails to provide a sufficient basis to satisfy the hospital's burden. Even were we to accept the doctor's assertion that Mrs. Boyd is willing now to accept medication, it would not answer the question whether she would reaffirm her earlier rejection of the drugs upon learning that, if she did so, her decision might well be respected.

On remand, the trial court can adequately deal with any factual question concerning Mrs. Boyd's present mental condition and wishes. If it turns out that Mrs. Boyd is still incompetent but now expresses no reluctance to receive psychotropic medication, the court, in Mrs. Boyd's best interest, cannot altogether ignore her present frame of mind; but the court will have to consider whether it may have been affected by the use of drugs pursuant to the trial court's earlier order. With the aid of Mrs.

Boyd's counsel and medical testimony, the court will then have to determine the extent to which circumstances affecting Mrs. Boyd during the pendency of this appeal can be said to affect the choice she would now make for herself as to medical treatment, if competent.

15. At oral argument, the government conceded that at the time of the hearings, the hospital did not have a compelling justification for overriding Mrs. Boyd's religiously based objection to medication. It made this concession despite evidence that Mrs. Boyd was then presenting a management problem to the hospital staff and at times had physically and verbally assaulted patients and staff. The government acknowledged, however, that isolation of Mrs. Boyd rather than medication would provide enough protection for others. *But see Rennie, supra* at 1145.

The trial court may consider anew whether any state interest would override Mrs. Boyd's putative choice. *See* note 9 *supra.* In evaluating such a claim, however, the court should keep in mind that this court had held that a state interest justifying intrusion on an individual's First Amendment rights must be "compelling." *Osborne, supra* at 374; *see West Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 639, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). *See generally* Cantor, *supra* at 242–254; Note, *An Adults Right to Refuse Blood Transfusions: A View through John F. Kennedy Memorial Hospital v. Heston,* 47 Notre Dame Lawyer 571, 575–82 (1972). In addition, this court has rejected the notion that even the preservation of the individual's life, against his or her will, would be a compelling state interest. *Osborne, supra* at 375 n.5; *accord, Brooks, supra,* 32 Ill.2d at 372–74, 205 N.E.2d at 442.

Finally, even if a state interest is sufficiently compelling to justify overriding appellant's will, the court must order only the least intrusive form of treatment. *See Rennie, supra* at 1146, for the state's interest must necessarily decrease as the degree of bodily invasion increases. *See Quinlan, supra,* 70 N.J. at 41, 355 A.2d at 664.