Elizabeth ·Ann HENKIN, By her Mother and Legal Guardian, Sylvia R. Henkin, Plaintiff,

v.

SOUTH DAKOTA DEPARTMENT OF SOCIAL SERVICES through its Division of Mental Health and Mental Retardation, Donald Forman, South Dakota Board of Social Services, Alexander Wylie, Pat Kenner, Dolores Bullert, Tom Ludgate, Anne Mastrovich, Carol Anderson, Henry Niedringhaus, South Dakota Department of Education and Cultural Affairs through its Division of Elementary and Secondary Education, Harris Wollman, South Dakota State Board of Education, the South Dakota Board of Charities and Corrections, Larry Dahlstrom, Sydna Cheever, Lambert Holland, Frank Brost and Ted Spaulding, Defendants.

Civ. No. 78–4088.

United States District Court, D. South Dakota, S. D.

Sept. 25, 1980.

---

William P. Fuller of Woods, Fuller, Shultz & Smith, Sioux Falls, S. D., for plaintiff.

Janice C. Godtland, Asst. Atty. Gen., Pierre, S. D., for defendants.

## MEMORANDUM DECISION

NICHOL, District Judge.

This is a civil rights action tried to the Court, and brought by the plaintiff Elizabeth Ann Henkin, by her mother and legal guardian, Sylvia R. Henkin. Plaintiff alleges an abridgement of her civil rights, violations of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. section 794 (1974), and the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. section 6000 et seq., arising from the termination of state funding of plaintiff's tuition at the Brown Schools in San Marcos, Texas. The defendants are the South Dakota Department of Social Services, the South Dakota Board of Social Services, the South Dakota Department of Education and Cultural Affairs the South Dakota State Board of Education, and the South Dakota Board of Charities and Corrections. Plaintiff seeks injunctive and monetary relief.

Plaintiff, Elizabeth Ann Henkin, is a twenty-four year old woman suffering from severe handicaps. She is severely mentally retarded, epileptic, and behaviorly maladjusted. Intelligence quotient tests place her at an IQ of 43; she has a social age of approximately ten years old. Elizabeth possesses basic self-help skills although she requires assistance and supervision to complete these satisfactorily. For example, despite Elizabeth's twelve year residency at the Brown Schools, she cannot reliably walk to familiar places on the campus.

Elizabeth is also an epileptic. She is subject to grand mal seizures, meaning total body involvement during a seizure. She is unable to discern when a seizure is going to occur—although they are precipitated by jerky movements—and therefore is unable to take any preparatory action.

Of greater importance is Elizabeth's maladaptive behavior. She requires constant supervision and attention. She can be disruptive, self-abusive, and aggressive. She steals and stores items belonging to staff and other residents. She is also subject to temper tantrums, which can last in duration approximately ten to twelve hours.

In 1965, at the age of nine, Elizabeth was admitted to the Brown Schools, San Marcos, Texas. She was referred to the Brown Schools through the South Dakota Department of Public Instruction. The Brown Schools institution is private and is not certified to participate in the Medicaid program, Title XIX of the Social Security Act (42 U.S.C. section 1396 et seq. 1974). Plaintiff's treatment at the Brown Schools was paid by the South Dakota Department of Education, the Sioux Falls School District, and Elizabeth's mother and legal guardian, Sylvia R. Henkin, until 1976, when Elizabeth Ann became 21. Until 1976 the State, through the Department of Education and the Sioux Falls School District, paid the tuition for Elizabeth under the Education for All Handicapped Children Act. The funding for Elizabeth terminated at the end of the fiscal year in which she turned twenty-one years old. Since that time Mrs. Henkin alone has paid the tuition.

After the State's termination of funding for Elizabeth's tuition at the Brown Schools attempts were made by her mother and legal guardian, Mrs. Henkin, to secure alternative funding and facilities. The Department of Social Services, Division of Rehabilitation Services, rejected Elizabeth because she did not have the ability to be gainfully employed. The Superintendent of Custer State Hospital informed Mrs. Henkin that Custer could not accept Elizabeth as she is ambulatory and Custer only accepts non-ambulatory patients. Redfield State Hospital and School denied Elizabeth's original application although she was later accepted on a 30 day evaluation basis.

In August 1977 Mrs. Henkin wrote to and spoke with federal officials, including Senator McGovern and then Congressman now Senator Pressler, in an effort to secure

funding for Elizabeth's tuition at the Brown Schools. In October 1977 Mrs. Henkin met with representatives of various organizations, including the National Association of Private Residential Facilities, the National Epilepsy Foundation, and the President's Commission on Mental Retardation.[1]

In November 1977 the Department of Social Services took Elizabeth's application for the Title XIX program. Elizabeth was approved by a medical review team for placement in an Intermediate Care Facility for the Mentally Retarded. Elizabeth's caseworker determined that she met the financial eligibility requirements. Because, however, Elizabeth was not in a Title XIX certified facility the Department of Social Services rejected her application in January 1978.

The present suit was filed on September 11, 1978. Plaintiff seeks a mandatory injunction commanding that defendants resume funding plaintiff's tuition at the Brown Schools or in the alternative provide plaintiff with a program of appropriate care within South Dakota. In the alternative to continued funding, plaintiff seeks a compensatory damage award consisting of an amount for plaintiff's residency at the Brown Schools, based on plaintiff's life expectancy. Plaintiff further seeks judgment in the sum of $35,000 with interest for the costs incurred by plaintiff for tuition at the Brown Schools since the State terminated the funding in July of 1977. Plaintiff also seeks costs and attorney's fees.

The testimony at trial concerned two facets of this controversy. First, whether there was an appropriate alternative to the Brown Schools that could be funded through Title XIX. Second, whether money exists through which plaintiff's continued care at the Brown Schools could be funded.

Defendant Department of Social Services refuses to fund Elizabeth's continued residence at the Brown Schools because it is not a Title XIX certified facility. It is the plaintiff's contention that there is no South Dakota facility or treatment center that can appropriately meet Elizabeth's needs. Despite numerous suggestions from the Department of Social Services, Mrs. Henkin could not locate an appropriate out-of-state Title XIX treatment center. At trial the defendants contended that Sioux Vocational School for the Handicapped was an appropriate facility for Elizabeth. Sioux Vocational School is a Title XIX certified facility located in Sioux Falls, South Dakota.

There are basic differences in the two facilities in question—Sioux Vocational and Brown. The two facilities employ differing methods to treat maladaptive behavior such as Elizabeth's. The Brown Schools have developed a program that includes positive reinforcement on a one-to-one basis and token reinforcement such as food and drink. This is employed to the greatest extent possible. If, however, this fails, aversive treatment consisting of time-out, physical holding, and ultimately security is employed. Security consists of a locked time-out room that is monitored by a nurse. The use of security at the Brown Schools may be only implemented upon the order of Ms. Wofford, program head for Elizabeth's treatment center, and Elizabeth's psychiatrist. Ms. Wofford and Dr. James Craft, a court-appointed expert, both testified that security is an effective technique in controlling Elizabeth's maladaptive behavior. It was Ms. Wofford's conclusion that without the use of security Elizabeth's temper tantrums would increase in frequency and duration. Prior to the use of security Elizabeth's tantrums lasted from from four to ten hours. More recently they have been less than an hour in duration.

1. Other possibilities were explored through the Department of Social Services such as whether the Legislature would provide a state appropriation for funding unique cases, and whether it was possible for the plaintiff to become a resident of the state of Texas. As to the former nothing resulted, and the latter was deemed impossible since Mrs. Henkin, the plaintiff's mother and legal guardian, was a resident of South Dakota.

Eileen Van Soest, a training program specialist from Sioux Vocational School who evaluated Elizabeth for possible placement in the Sioux Vocational School, testified that Sioux Vocational School does not, and would not, employ security in its treatment of maladaptive behavior. She testified that Sioux Vocational School employs only positive methods for behavior modification. This includes positive reinforcement comparable to that used at the Brown Schools, and if this fails, mild aversive treatment consisting of time–out and physical holding. She further testified that if positive reinforcement attention and structure did not produce the intended behavior modification, Elizabeth would have to be discharged. If a person needed security she was not appropriately placed in Sioux Vocational School. Van Soest also testified that appropriate reinforcement for Elizabeth would require the hiring of additional staff at Sioux Vocational School. At present the Brown Schools have a one–to–four ratio of staff to patient, with one–to–one when necessary. Sioux Vocational School has a ratio of one–to–seven staff to patient.

Another area of concern in handling Elizabeth is her epilepsy. Hard seizures of one to ten minutes duration occur at a rate of one or two a month. The Brown Schools recommend a twenty–four hour supervision since Elizabeth is unable to take preparatory action against the seizures. This recommendation is supported by the Texas team of evaluators from the Texas Department of Mental Health and Mental Retardation. Based on Van Soest's report, however, Sioux Vocational School does not recommend twenty–four hour nursing supervision for Elizabeth.

Of final and greatest concern in any discussion of possible placement of Elizabeth in Sioux Vocational School is the regression that all witnesses agreed will occur upon Elizabeth's transfer from the Brown Schools to another facility. Van Soest agreed with Wofford that less structure and attention would result in an increase in maladaptive behavior. There would also be, according to Wofford, a regression in self–help skills. Since any change in either Elizabeth's program or environment would result in an increase in her maladaptive behavior, Wofford concluded that removal from the Brown Schools would cause immediate regression, the nature and extent of which could not be predicted. Dr. Craft also testified that Elizabeth would suffer regression and that her maladaptive behavior would greatly increase. If all went well, he predicted, the regression would last three months, although he testified that even that figure was a guess.[2] He emphasized that a one–to–one staff to patient ratio would have to be employed at Sioux Vocational, and yet he felt that positive reinforcement alone would be insufficient in the transitional period.

The second facet of the controversy involves whether South Dakota has money through which Elizabeth's continued care at the Brown Schools could be funded. Tom Scheinost, of the Division of Mental Health and Mental Retardation, Department of Social Services, testified in regard to various state programs as related to Titles XIX and XX of the Social Security Act. It was his view that Title XX money is used more for stimulation and experimentation, whereas Title XIX money is used for long–term care. He further testified that Title XX money is not restricted to Title XIX–certified facilities and that in recent years South Dakota children have been placed in the Brown Schools with Title XX as a funding source.

Scheinost explained that under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. section 6000 *et seq.*, South Dakota received $250,000 in 1979. He acknowledged that Elizabeth fell within the definition of developmentally disabled

---

2. The basis for the doctor's three month projection *stemmed from* his experience with a case similar to the present case. In *Bobby Jenkins v. Cowley*, a Texas state facility duplicated the training program of another center from which Jenkins was transferred. Dr. Craft related that Jenkins fell into serious regression and his maladaptive behavior greatly increased. In that case the regression lasted approximately three months.

as defined in the Act. Scheinost concluded, however, that neither Title XX nor the Developmentally Disabled Assistance Act could be used for long–term care, but instead are directed toward short–term programs.

This case raises the following issues:

1) Whether the plaintiff, Elizabeth Henkin, is entitled to state benefits and financial assistance under the Developmentally Disability Assistance and Bill of Rights Act, 42 U.S.C. section 6000 *et seq.*?

2) Whether the defendants through state custom and usage have denied the plaintiff her constitutional right to equal protection?

3) Whether the plaintiff has been denied her federal statutory right to nondiscriminatory rehabilitation under 29 U.S.C. section 794?

4) Whether the plaintiff has been wrongfully denied her state statutory right to appropriate services for habilitation and treatment?

The Court turns first to the question of whether there is a statutory ground upon which this action may rest as the federal courts have long been directed to decide this question before they adjudicate constitutional law questions.[3] Further, since this Court's interpretation of the state statutes involved might be rejected by the state's courts the preferred order, therefore, is to turn first to the federal statutory issues.

Plaintiff, in her first amended complaint, alleges a cause of action under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. section 6000 *et seq.* (1976) (hereinafter the "Act"). Specifically, that she is entitled to state benefits and financial assistance under the Act. Defendants argue that the Act is not an act of personal entitlement; that the plaintiff has another source of funding under Title XIX; that the Act does not provide for the extended care of individuals; that in the distribution of funds received under the Act the state must be assured that the receiving facility satisfies standards comparable to those set down by Title XIX, which is not possible with the Brown Schools; and that the plaintiff has failed to state a cause of action under the Act.

The Act protects and provides for those with developmental disabilities. It is undisputed that the plaintiff, as a mentally retarded person, falls within the Act's definition of developmentally disabled.[4] Thus, falling within the definition of developmentally disabled the plaintiff is entitled to certain rights and benefits. *Halderman v. Pennhurst State School & Hospital*, 612 F.2d 84, 95 (3d Cir. 1979). The Bill of Rights section of the Act, 42 U.S.C. section 6010, makes plain Congress' intention that the developmentally disabled have a right to appropriate treatment, services and habilitation. *Halderman, supra* at 95. This intention is further supported by the language of the Act that provides that no funds are to be provided to "any institution or other residential program for persons with developmental disabilities that–(A) does not provide treatment, service, and habilitation which is appropriate to the needs of such persons . . . ." 42 U.S.C. section 6010(3)(A). "It is hard to see how Congress could have been any more precise in revealing its intention to confer a right to treatment or habilitation." *Halderman,*

---

**3.** *See Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974).

**4.** Section 6001(7) defines developmental disability as a "severe, chronic disability of a person which–

(A) is attributable to a mental or physical impairment or combination of mental and physical impairments;

(B) is manifested before the person attains the age twenty–two;

(C) is likely to continue indefinitely;

(D) results in a substantial functional limitation in three or more of the following areas of major life activity: (i) self–care, (ii) receptive and expressive language, (iii) learning, (iv) mobility, (v) self–direction, (vi) capacity for independent living, and (vii) economic self–sufficiency, and

(E) reflects the persons need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated."

*supra* at 96. The Act further provides that such treatment, services, and habilitation should be designed to maximize the developmental potential of the person. 42 U.S.C. section 6010(2).

Defendants contend, however, that the purpose of the Act is to allow the state to monitor, coordinate, and plan services for all developmentally disabled people. It is defendants' contention that individuals are not entitled to direct funding under the Act, or to direct benefits. Thus, defendants conclude that they cannot pay for Elizabeth's residency at the Brown Schools with funds received under the Act.

■ It is important to note, however, that the Act relates to funding programs, not facilities. The purpose of the Act is to strengthen state services and programs for the developmentally disabled. This in no way, however, denies a developmentally disabled person the rights and benefits under the Act, specifically the right to appropriate treatment designed to maximize the developmental potential of the individual. There is nothing in the Act that forbids a state from funding a program that provides appropriate treatment for an individual whose needs cannot be met by any of the state's facilities.

That individuals are entitled to seek benefits from the Act is further supported by the case law. In *Halderman, supra,* the court held that "retarded persons have a private right of action under the Act." 612 F.2d at 97. *Accord, Naughton v. Bevilacqua,* 458 F.Supp. 610 (D.R.I.1978), *aff'd,* 605 F.2d 586 (1st Cir. 1979). As the court in *Naughton* observed, "(t)he enforcement of individual rights . . . cannot be achieved solely by withholding federal funds; . . . a private right of action [is] crucial to protect the rights secured by the Act." 458 F.Supp. at 616. Applying the four factor test set forth in *Court v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975),[5] the

courts in *Naughton* and *Halderman* found that the developmentally disabled were "especial beneficiaries" of the Act; that private suits would effectuate the policies of the statute by facilitating improvements in the delivery of services to the developmentally disabled without forcing the federal government to the drastic measure of cutting off funds; that there was legislative intent to create a private remedy under the Act evident from the conference report which stated that the right to receive treatment should be protected by Congress and the courts; and that private suits would not infringe on the traditional state prerogatives. *Halderman, supra* at 98–99. "While providing for the health and well–being of the citizenry is surely a legitimate state function, Congress' recognition of a right to treatment in section 6010 is not a simple displacement of that admittedly basic state concern." *Id.*

There is nothing in the language of the Act or in the case law that prevents the plaintiff from seeking, by a private right of action, funds for tuition at the Brown Schools. This could easily be achieved by setting up a program to receive Act funds for use in funding special projects. For example, in the plaintiff's case where there is no appropriate care facility within the state, the program would provide funding for residency in an out–of–state facility.

Indeed the language of the Act supports such a conclusion. Services are defined as including specialized services and more specifically, special living arrangements. 42 U.S.C. section 6001(8)(A). Section 6062 provides for the combining of allotments from several states where those states have a cooperative or joint effort. Clearly this language demonstrates an intention that such cooperative programs are to be encouraged, especially where one state's facilities can offset a deficiency in the facilities of another state.

---

5. *Court v. Ash* set forth four relevant factors to be considered in determining whether a private remedy is implicit in a statute: (1) whether the plaintiffs are especial beneficiaries of the statute, (2) whether there is any indication of legislative intent to create a private remedy, (3) whether a private remedy would further the policies of the statute, and (4) whether the cause of action is one traditionally relegated to the states.

Defendants contend, however, that since the plaintiff is already qualified to receive Title XIX funds she does not fall within the definition of a priority person and that Act funds cannot be used to duplicate existing fund sources. The Court finds this argument unpersuasive.

The Act defines priority person as one "whose needs cannot be covered or otherwise met under the Education for All Handicapped Children Act, the Rehabilitation Act of 1973, or other health, education, and welfare programs." 42 U.S.C. section 6000(b)(2)(A). The plaintiff's funding under the Education for All Handicapped Children was terminated upon her reaching the age of twenty-one. The only other existing source of funding was Title XIX, in which the Brown Schools chose not to participate. Based on the testimony at trial Sioux Vocational School was the closest alternative to the Brown Schools that was Title XIX certified. Yet Sioux Vocational School cannot provide the plaintiff with the treatment needed to counter her most serious disability—maladaptive behavior. A transfer to Sioux Vocational School involves a risk that could result in severe regression and possible discharge if treatment fails. Thus, the plaintiff is too old to receive funding from her previous source (Education for All Handicapped Children), and there is no appropriate Title XIX care facility where the plaintiff can receive Title XIX benefits. Thus the plaintiff is denied her only other funding source. It appears that the plaintiff falls within a gap of services offered to the mentally retarded, and thus, can be considered a priority person under the Act. It is, however, important to note in this context that the Act's benefits are not denied those who are not priority persons. Section 6000(b)(2)(A) merely provides that in the assistance of offering services to the mentally retarded there will be priority given to those who fall within a gap of services from other areas. The section in no way limits the Act to benefiting only those who fall within the gap of services.

There will be no duplication of funding source as the defendants contend. The only funding source is Title XIX and that source is of no use to the plaintiff at the Brown School. The Title XIX certified facilities offered to the plaintiff are also of no use in treating the plaintiff's serious disabilities. At the Brown Schools the plaintiff will not be receiving Title XIX funds. There will be no duplication.

■ Defendants next argue that the Act does not provide funds for the extended care of individuals. A close reading of the Act requires a different conclusion. Congress makes clear in its declaration of findings and purpose that persons with developmental disabilities often require life–long services to meet their needs. 42 U.S.C. section 6000(a)(3). Indeed the definition of developmental disability includes a disability which "reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services *which are of lifelong or extended duration* and are individually planned and coordinated." (emphasis added). 42 U.S.C. section 6001(7)(E). Further, the definition of "case management services" includes follow–along services, life–long if necessary, to insure that the person's changing needs are met. 42 U.S.C. section 6001(8)(C)(i). There is nothing in the language of the Act that suggests that extended care for individuals is prohibited.

■ Defendants next argue that in distributing Act funds a state must be assured that the receiving institution meet standards at least equivalent to the medicaid, or Title XIX, standards. Defendants rely on section 6010(4)(A) of the Act in contending that South Dakota has no method of determining whether such standards are being met by the Brown Schools since the facility does not participate in Title XIX. This argument lacks merit for several reasons. First, the language of the Act is not phrased in the mandatory word "must" but instead provides that programs *should* meet standards equivalent to Title XIX. Second, the Brown Schools are accredited by the Joint Commission on Accreditation of Hospitals (JCAH). The standards used for the

accrediting process are comparable to Title XIX standards. Dr. Craft testified that the JCAH standards are difficult to achieve as they are the highest level of accreditation attainable. By using the standards set out by the JCAH South Dakota would have no difficulty in determining whether the Brown Schools met minimum standards equivalent to those set by Title XIX. South Dakota is aware of the standards as some of the facilities in the state are also accredited by JCAH.

■ Defendants' final argument is that the plaintiff has failed to state a cause of action under the Act since the Act is meant to protect only those developmentally disabled persons who are in a state institution. In support of this argument defendants cite the *Halderman* and *Naughton* decisions. These two decisions both involve plaintiffs confined in state institutions. They are the only cases to date that have interpreted the Act. In *Halderman* the Third Circuit Court of Appeals held that "the Developmentally Disabled Assistance and Bill of Rights Act grants the mentally retarded a right to treatment and habilitation. We further hold that retarded persons have a private right of action under the Act." 612 F.2d at 97. The court did not limit its holding to developmentally disabled who are confined in state institutions. Instead it includes all mentally retarded in its holding.

The wording of the Act does not lend itself to the defendants' interpretation. It is not meant to be so restrictive. There is nothing in the language of the Act that suggests that it is to be limited to those individuals in state institutions. Indeed, the Congressional findings provide for the strengthening of programs, especially ones that reduce or eliminate the need for institutionalization. 42 U.S.C. section 6000 (a)(5). Services are defined to include such things as day care, domiciliary care, special living arrangements, alternative living arrangements including in–house services. 42 U.S.C. section 6001(8)(A), (E). The above mentioned services are aimed at those not in institutions. The Court is of the opinion that the *Halderman* and *Naughton* decisions apply a portion of the Act that is aimed at ridding the institutional system of its defects (see 42 U.S.C. section 6010(3)), but that those sections are not the limit of the Act's scope. The Act applies to all those individuals with developmental disabilities.

The Court holds that the plaintiff, as a developmentally disabled person, has a federal statutory right, under the Developmentally Disabled Assistance and Bill of Rights Act, to appropriate treatment and service.[6] This right has been violated by a refusal on the part of the defendants to provide any funds for the plaintiff's treatment when no such appropriate care exists in South Dakota.

The Court determines that the plaintiff is entitled to funding at the Brown Schools by virtue of the Act. Accordingly, the other issues raised as to the state statutory right to treatment and constitutional claim of denial of equal protection are not addressed by this decision.

■ Defendants argue, however, that any relief requiring allocation of funds from the state treasury is barred by the Eleventh Amendment. In support of their contention, the defendants urge the case of *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662, 666 (1974). Yet *Edelman* specifically acknowledges the contin-

---

6. As noted in the *Halderman* decision, 612 F.2d at 100, one court has held that claims brought under the Act must be adjudicated in state court. *United States v. Solomon*, 563 F.2d 1121, 1125 (4th Cir. 1977). Relying on the Conference Report on the Act, which stated that the right to treatment "should be protected and assured by the Congress and the courts," the *Solomon* Court held that this language refers to a state judicial forum, not federal. 563 F.2d at 1124–25. This Court, however, does not find the analysis persuasive. Instead this Court will follow the analysis of the *Halderman* Court. "If anything, the legislative history reflects a Congressional belief that States were not spending funds for the disabled effectively. The Developmentally Disabled Assistance and Bill of Rights Act sought to change the traditional spending habits of the states. It is most unlikely that Congress intended those changes to be enforceable only in state courts." *Halderman*, 612 F.2d at 100.

ued availability of prospective injunctive relief even though such relief realistically does impose financial burdens. 415 U.S. at 667–68, 94 S.Ct. at 1357–58. See *Halderman, supra* at 109. All the relief ordered here is prospective.

It is therefore ordered that injunctive relief, requiring the defendants to provide funds for the plaintiff's residency at the Brown Schools in a sum at least comparable to the amount it would expend for the plaintiff's stay in an in–state facility, is proper. Since the Court's decision rests on a statute that does not provide for attorney fees, none can be granted. Counsel for the plaintiff will prepare an order in accordance with this memorandum decision.

The foregoing memorandum decision constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.