James D. LYNCH, Jr.

v.

Edward H. MAHER in his official capacity as Commissioner of the Department of Income Maintenance of the State of Connecticut.

Civ. No. H–79–681.

United States District Court, D. Connecticut.

Feb. 4, 1981.

**1270**

Raymond R. Norko, Legal Aid Society of Hartford County, Hartford, Conn., Rosalind Silverstein, P. Alain McMahon, Legal Aid Society of Hartford County, Bristol, Conn., for plaintiff.

Hugh Barber, Asst. Atty. Gen., Hartford, Conn., for defendant.

## RULING ON DEFENDANT'S MOTION TO DISMISS; DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; AND PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

BLUMENFELD, Senior Judge.

The plaintiff, James Lynch, is a 35-year-old quadriplegic who has been living in his own home with nursing care provided by the State of Connecticut pursuant to a Medicaid program governed by 42 U.S.C.S. § 1396a (Cum.Supp.1980). The defendant, Edward Maher, is the Commissioner of the Connecticut Department of Income Maintenance and is responsible for administering the Medicaid program. *See* Conn.Gen.Stat. Ann. § 17–134a, 17–2a (West 1975 & Cum. Supp.1980). Under the program, the Department reimburses private providers of home health care to patients who have been authorized by the Department to receive such care. This case arises from a decision by the defendant not to approve any future application by a private provider for home care services to the plaintiff. The Department claims that its decision is based on the medical opinion of its employees that the plaintiff's medical needs cannot be met by home health care, but require care in an institution. The plaintiff claims that the defendant reached its decision without providing the plaintiff a hearing as required by both the due process clause of the fourteenth amendment and by the Medicaid Act. The plaintiff also argues that the defendant's decision was not based on medical judgment at all, but rather on administrative policies of not approving home care

applications for patients who either require more than 20 hours per week of care or who are eligible for admission to an institution. The plaintiff challenges these policies as inconsistent with the equal protection clause of the fourteenth amendment, the Social Security Act, 42 U.S.C.S. § 1396a (Cum.Supp.1980) and section 504 of the Rehabilitation Act of 1973, 29 U.S.C.S. § 794 (Cum.Supp.1980). Finally, the defendant's decision is attacked as unlawful discrimination against the handicapped, forbidden by section 504 of the Rehabilitation Act of 1973, 29 U.S.C.S. § 794 (Cum.Supp.1980) and as denying him his rights under the Developmentally Disabled Bill of Rights, 42 U.S.C. § 6010, to receive appropriate treatment in the environment least restrictive of his personal liberty. These deprivations of federal statutory rights by the state are also the basis of a claim under 42 U.S.C.S. § 1983 (Cum.Supp.1980). *See Maine v. Thiboutot*, 448 U.S. 1, 3–9, 100 S.Ct. 2502, 2503–06, 65 L.Ed.2d 555 (U.S.1980). Jurisdiction is founded on 28 U.S.C.S. § 1331(a) (1977) as the matter in controversy exceeds $10,000 [1] and arises under the laws of the United States.[2]

The defendant is currently subject to a temporary restraining order, entered by this court on December 6, 1979, enjoining him from refusing to authorize the plaintiff to receive 56 hours of home health care per week. The plaintiff seeks a preliminary injunction requiring the defendant to authorize the plaintiff to receive whatever home care services he requires. The defendant has moved for dismissal and summary judgment.

### Factual Background

At a hearing on the plaintiff's application for a temporary injunction and the foregoing motions the following facts, largely undisputed, were developed.

---

[1] The cost of providing home care to the plaintiff would exceed $10,000 in less than a year. The defendant has not argued otherwise.

[2] The plaintiff also claims that jurisdiction is available under 28 U.S.C. § 1343(3). The court need not reach the issues thus presented, such

as whether section 504 of the Rehabilitation Act of 1973 and the Developmentally Disabled Bill of Rights are laws protecting equal rights, *see Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 620–23, 99 S.Ct. 1905, 1917–19, 60 L.Ed.2d 508 (1979) because jurisdiction is available under section 1331.

The plaintiff is a quadriplegic and needs extensive care in order to survive. He has been living in his own home, relying on home health care, friends and relatives for assistance. The plaintiff requires assistance in order to eat, drink, take medications necessary to avoid spasms, and get in and out of his wheelchair. He must be turned in bed and helped perform exercises. If unattended, he may lie in his excrement, is subject to pneumonia, ulcers, muscular contractions, muscle spasms, and respiratory infections caused by inadequate fluid intake. The plaintiff's immobility also subjects him to increased non-medical dangers. If unattended, he would be unable to escape from his home during a health-jeopardizing emergency, such as a fire. When alone, he often leaves the entrance to his home unlocked so that friends and attendants may enter.

The plaintiff has lived at home, more or less successfully, and has coped impressively with his disability. He has been hospitalized several times and has had several accidents such as falling out of his wheelchair. At times, he has not been fed or has lain in his excrement. He has, however, operated a business over a telephone and maintained a social life, including outings with friends.

Lynch received four hours a day of home care from 1976 through early 1979. From early 1979 until August 28, 1979, Lynch received eight hours of care a day. The private service providing care terminated that service on August 28, 1979.[3]

After the August 28th termination, the defendant decided that it would not approve any future application to provide home health care to the plaintiff, but would only approve payment for institutionalization. The parties dispute the reasons for the defendant's decision. The following, however, is clear:

1. The plaintiff had difficulty finding agencies willing to provide any amount of care because he was difficult to work for.

2. Dr. Clair Callan, the Department's medical officer, is of the opinion that the plaintiff needs more than eight hours a day of health care and indeed requires constant surveillance.

3. The defendant has not argued that the plaintiff requires specialized treatment that is available only in an institution. The defendant's decision not to approve any future application was based, apparently, on an assumption that any future application would be for continuation of eight hours a day of service and that even if that or any request for greater care were granted, the plaintiff would be unable to find the additional care Dr. Callan thinks he needs. The plaintiff contends that the defendant's decision was also based on an administrative policy of not paying for more than 20 hours per week of home care and on Lynch's eligibility for admission to an institution that would cost the state less than home care.

The Department never notified Lynch formally of its decision to deny any future application, but when his mother, his social worker and the Assistant Director of the Connecticut Office of Protection and Advocacy for the Handicapped and Developmentally Disabled Persons made special inquiries, they were informed of the defendant's decision.[4]

### Preliminary Injunction Standards

The plaintiff is entitled to a preliminary injunction if he demonstrates both irreparable harm and either (1) likelihood of success on the merits or (2) both the presence of sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships lean-

---

**3.** The plaintiff does not challenge the private health care provider's termination of service. Another court in this district has held that the state is not required to conduct a hearing before a private health care provider, which receives Medicaid funds, terminates service. *Wagner v. Sheltz,* 471 F.Supp. 903, 909–10 (D.Conn.1979) (Clarie, C.J.)

**4.** The plaintiff requested a fair hearing on September 24, 1979, and on December 20, 1979 the hearing officer required the Department to authorize 28 hours per week of home care. The issue in the present case, of whether a hearing should have been held in August 1979, is not affected by the holding of a hearing at a later time.

ing decidedly in his favor. *Caulfield v. Board of Education*, 583 F.2d 605, 610 (2d Cir. 1978). A psychiatrist who examined the plaintiff swore in an affidavit that if Lynch were institutionalized "There is a high probability that [he] would lose his motivation to care for himself and assume a hopeless and defeated attitude which in my professional judgment would then have an adverse effect on his well-being." If Lynch were not institutionalized he would die without medical care to replace the state provided home care assistance he now receives. There is no evidence that he would be able to obtain any substitute care on his own.[5] In such circumstances, irreparable injury is obvious. Money damages could not compensate Lynch for the consequences of a discontinuation of care. *See Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam). The severity of the consequences of termination also support a finding that in light of the minimal state interest at stake[6] the balance of hardships weighs heavily in favor of Lynch. To establish his entitlement to a preliminary injunction, therefore, plaintiff must demonstrate the presence of serious questions going to the merits which constitute a fair ground for litigation.

I will consider the plaintiff's contentions, therefore, to resolve his motion for a preliminary injunction, and the defendant's motions for dismissal and summary judgment.

I. *Right to a Hearing*

The plaintiff claims both a statutory and a constitutional right to a hearing at the time the defendant decided it would not approve any future request for home care. The Medicaid statute itself provides that "A State plan for medical assistance must ... provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assist-

ance under the plan is denied...." 42 U.S.C.S. § 1396a(a)(3) (1973). Federal regulations require, more specifically, that a hearing meeting specified requirements be held before "termination, suspension or reduction of medicaid eligibility or covered services." 42 C.F.R. §§ 431.200–431.250 (1979). Notice must be given at least ten days before any such action. *Id.* § 431.211.

Connecticut does have a fair hearing system that purports to be in accordance with the federal regulatory requirements. *See* Conn.Gen.Stat.Ann. § 17–2a (West Cum. Supp.1980). The only issue, therefore, is whether the Department's decision not to approve any future request for benefits was a "termination" within the scope of the regulations or, even if it were not, whether this was a type of action requiring a hearing under the rule of *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The Connecticut Department of Social Services provides "Home Health Aide Services" to persons eligible under Title XIX (Medicaid), but requires prior authorization for services exceeding 12 hours per month. 3 *Medical Assistance Program Manual*, ch. III ¶ 229 (Oct. 3, 1978). The health care provider, not the recipient, files the request for authorization. *See id.* ch. VII ¶ 617 (Jan. 26, 1978). Such a request must be made both for authorization of new services and extension of prior services. *See id.* at 3–4. No such request was made on behalf of Lynch during the time in question. Although the Department had communicated its decision to deny any future application, the Department did not terminate, reduce or refuse benefits. The federal regulation, therefore, was not violated. Similarly, the constitutional right to a hearing does not attach at least until the state

---

5. The plaintiff was admitted to a hospital on August 30, 1979, two days after his home care was discontinued, because he had no alternative means of obtaining care. He was released on September 14, 1979.

6. Although the state has several policies restricting reimbursement for home care that appear to be based on fiscal restraint and admin-

istrative convenience, the state has maintained that its treatment of Lynch was motivated only by medical judgment. Any hardship imposed on the state by not allowing it to exercise a paternal interest is insignificant in comparison to the consequences of a discontinuation of medical care or the deprivation of a protected liberty interest.

cuts off or refuses an application for an entitlement. Before then, the state has not deprived the potential recipient of anything. In this case, the Department made only a preliminary decision with no independent or immediate legal effect. The state does provide a hearing before ultimately denying an application for health care. Indeed, such a pre-termination hearing is the most that has ever been required by the Supreme Court. *See Mathews v. Eldridge*, 424 U.S. 319, 340, 96 S.Ct. 893, 905, 47 L.Ed.2d 18 (1976). No more process is due. *Cf. Georator Corporation v. EEOC*, 592 F.2d 765, 768–69 (4th Cir. 1979) (Due Process clause does not mandate review of EEOC determination of reasonable cause because that decision is not a final determination of rights).

For the reasons above, Lynch's complaint does not state a cause of action for deprivation of either a statutory or a constitutional right to a hearing. The defendant's motion to dismiss counts one and two is granted.

## II. *The Department's Decision to Refuse Home Care*

The defendant's decision to subsidize institutionalization but not home care is challenged as based on impermissible policies and as inconsistent with the Developmentally Disabled Bill of Rights, 42 U.S.C. § 6010, which the plaintiff claims requires treatment in the environment least restrictive of the patient's liberty, and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which forbids discrimination against the handicapped in federally funded programs. Although the defendant has not implemented its decision, by formally refusing a request by a private provider, the defendant has not argued that its decision is not ripe for review for failure to exhaust administrative remedies or lack of final agency action. Such an argument would be unavailing, however, because the defendant has indicated in open court that it will not approve such a request under any circumstances. The defendant has noted that a state fair hearing officer has already decid-ed that Lynch is entitled to 28 hours of care a week—less than the 56 hours Lynch *claims* to need and previously ordered by this court. See note 4, *supra*. The defendant has stated in its brief that if the motion for preliminary injunction is denied, the plaintiff will receive only 28 hours per week. The Department will then attempt to terminate even this, giving the plaintiff an opportunity for yet another fair hearing. Memorandum in Opposition to a Preliminary Injunction at 6 n.3. Thus, if the plaintiff's motion is denied, he will be left with allegedly insufficient care and be required to return again to the state administrative forum in which his federal claims may not be fully litigated. Such delay in adjudicating a section 1983 claim is not required. *See Gonzalez v. Shanker*, 533 F.2d 832, 837–38 (2d Cir. 1976) (exhaustion of state administrative remedies not necessary when they are not adequate to litigate the substance of a § 1983 claim).

### A. *The 20-hour Limitation and Concurrent Eligibility Program*

The Connecticut Department of Social Services manual states that reimbursable home health care is limited to 20 hours per week. 3 *Medical Assistance Program Manual*, ch. III ¶ 229.1 (Oct. 3, 1978). The plaintiff claims that the defendant's decision to deny him home care benefits was based on this policy and on his eligibility for admission to an institution.[7] The plaintiff challenges these administrative policies as inconsistent with the Medicaid statute, federal Medicaid regulations, section 504 of the Rehabilitation Act of 1973, and the Equal Protection clause of the fourteenth amendment. Success under any theory requires, however, proof that the plaintiff has suffered by application of the policies at issue. The Associate Director of the Department of Medical Services, Dr. Clair Callan, testified at the preliminary injunction hearing that she would not approve any future request for home health care for Lynch because, in her judgment, such care for only eight hours per day would be insufficient to

---

7. At the present stage of the case, it is not necessary to decide whether the defendant in fact maintains a policy of not funding home

care when a patient is eligible for admission to an institution that would cost the state less.

meet Lynch's medical needs. This testimony is corroborated by a letter dated October 2, 1979 from Stephen Press, Director of Health Services, to one of Lynch's attorneys, David Shaw, stating that home care would not be authorized because "Mr. Lynch cannot receive proper medical care at his home . . . ." Furthermore, it is not disputed that until Mr. Lynch's care was discontinued by the private agency, he was receiving 56 hours of home care per week, pursuant to an exception to the 20-hour policy.

█ The limited evidence in the record at this preliminary stage of the proceedings suggests that the plaintiff may not have standing to challenge these administrative policies because they were not applied to him. But until the case is fully litigated, and a factual record is developed that is extensive enough to determine the defendant's true reasons on the basis of something more than its own bare assertions, summary judgment or dismissal would be inappropriate. The defendant seems to have relied on medical grounds alone to determine that any further request for eight hours of care a day would be denied. The defendant's decision, however, was not to approve any further application for home health care. Such a decision would also preclude applications for more than eight hours per day of care. The latter decision—not to provide any care even, perhaps, if it were medically adequate in the Department's view—may have been based on the contested policies. On the present state of the record, it is still disputed whether the plaintiff has been denied home care benefits sufficient to meet his needs on the basis of arbitrary regulations or practices. Summary judgment is therefore inappropriate.

B. *The Developmentally Disabled Bill of Rights*

Lynch argues that Connecticut must provide him with home care because as a "developmentally disabled" person he has a statutory right under the Developmentally Disabled Bill of Rights, 42 U.S.C. § 6010, to the treatment that is least restrictive of his personal liberty. The state argues that the statute does not require home care for Lynch because (1) treatment in the least restrictive environment is not required, but merely encouraged, (2) even if care in the least restrictive environment were required, an institution is the least restrictive environment medically appropriate for Lynch and (3) the statute does not apply to programs not funded by the Developmentally Disabled Assistance Act, 42 U.S.C. §§ 6000–6081, of which the Developmentally Disabled Bill of Rights is a part.

The Developmentally Disabled Bill of Rights provides that

Congress makes the following findings respecting the rights of persons with developmental disabilities:

(1) Persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities.

(2) The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

(3) The Federal Government and the States both have an obligation to assure that public funds are not provided to any institutional or other residential program for persons with developmental disabilities that—

(A) does not provide treatment, services, and habilitation which is appropriate to the needs of such persons . . . .

42 U.S.C. § 6010. The Bill of Rights also enumerates certain minimal standards that must be met by institutions receiving government funds. *Id.* § 6010(3).

It is not contested that the plaintiff falls within the statutory definition of "developmentally disabled." [8] Although the statute

---

8. The statute provides that:

The term "developmental disability" means a severe, chronic disability of a person which—

(A) is attributable to a . . . physical impairment . . . ;

(B) is manifested before the person attains age twenty-two;

(C) is likely to continue indefinitely;

conceivably could be interpreted more restrictively on the basis of its history,[9] it is clear that Lynch's case meets the plain words of the definition.[10]

The parties disagree, however, over the nature and scope of the Developmentally Disabled Bill of Rights and Assistance Act. Three courts have held that the Bill of Rights, relied on by the plaintiff, establishes a substantive right to a particular form of treatment. In *Halderman v. Pennhurst State School & Hospital*, 612 F.2d 84 (3d Cir. 1979) (en banc), *cert. granted*, 447 U.S. 904, 100 S.Ct. 2984, 64 L.Ed.2d 853 (1980), the Third Circuit held that inhumane conditions in a state institution for the mentally retarded violated the Bill of Rights because the hospital provided neither appropriate treatment (habilitation), *id.* at 92–97, nor care in an environment least restrictive of personal liberty, *id.* at 103–07. The court held that the relief appropriate for most patients would be deinstitutionalization. *Id.* at 115. In *Henkin v. South Dakota Dept. of Social Services*, 498 F.Supp. 659 (D.S.D.1980), the district court held that the right to treatment provided by the Bill of Rights required the state to pay for out-of-state treatment of a retarded epileptic when no appropriate in-state institutions existed. *Id.*, at 664–667 (Lexis pages 11–21). In *Naughton v. Bevilacqua*, 458 F.Supp. 610 (D.R.I.1978), *aff'd*, 605 F.2d 586 (1st Cir. 1979) (other grounds), the district court denied a motion for summary judgment, holding that evidence of repeated dosages of a drug that had no habilitative effect, but was used only to control a patient, could prove a violation of the right to treatment. *Id.* at 614–15. One court has

---

(D) results in substantial functional limitations in three or more of the following areas of major life activity: (i) self-care, ... (iv) mobility, (v) self-direction, (vi) capacity for independent living, and (vii) economic self-sufficiency; and
(E) reflects the person's need for a combination and sequence of special, interdisciplinary, or generic care, treatment, or other services which are of lifelong or extended duration and are individually planned and coordinated.
42 U.S.C.S. § 6001(7) (Cum.Supp.1980).

**9.** The current definition was incorporated into the statute by a 1978 amendment. The former definition was limited to conditions "attributable to mental retardation, cerebral palsy, epilepsy, or autism," Pub.L.No.94–103, Title I, Part E, § 125, 89 Stat. 496 (1975), (current version at 42 U.S.C.S. § 6001(7) (Cum.Supp. 1980)), or

attributable to any other condition of a person found to be closely related to mental retardation because such condition results in similar impairment of general intellectual functioning or adaptive behavior to that of mentally retarded persons or requires treatment and services similar to those required of such persons . . . .

*Id.* The legislative history explaining the expanded definition is sparse. The Conference Report states that the new definition is "intended to cover everyone currently covered under the [prior] definition and is also intended to add other individuals with similar characteristics." H.Conf.Rep.No.95–1780, 95th Cong., 2d Sess. 104, *reprinted in* [1978] U.S.Code Cong. & Ad. News 7312, 7375, 7416.

Lynch became a quadriplegic when he was 19 years old as a result of a diving accident.

Although Lynch falls within the plain meaning of the current definition because he suffered a physical impairment before age 22 that has the requisite characteristics, the statute conceivably could be interpreted to not cover a disability caused by an accident that is not related to a neurological condition present before the accident. The statutory term "manifested," 42 U.S.C.S. § 6001(7)(B), may suggest that the disability must have existed from birth and become apparent before age 22, rather than merely be caused before age 22. Congress may not have intended to cover the results of all serious accidents that chance to occur before age 22. This restrictive interpretation of the statute is inappropriate, however, for two reasons. First, Congress specified criteria for determining what disabilities are similar to those formerly covered by describing characteristics of the disabilities it intended to cover. 42 U.S. C.S. § 6001(7)(D) (Cum.Supp.1980). Quadriplegia has these characteristics. Second, the congressional statement of purpose states specifically that the statute is designed to aid individuals who become disabled while young:

The Congress finds that ... individuals with disabilities occurring during their developmental period are more vulnerable and less able to reach an independent level of existence than other handicapped individuals who generally have had a normal developmental period on which to draw during the rehabilitation process.

42 U.S.C.S. § 6000(a)(2) (Cum.Supp.1980). Thus Lynch comes within the definition.

**10.** The state has not challenged Lynch's satisfaction of the section 6001(7)(D) conditions.

held that the Act does not require deinstitutionalization but only that institutions provide treatment that is appropriate and habilitative. *Kentucky Association for Retarded Citizens v. Conn.*, No. C 78–0157(A), slip op. at 19–21 (W.D.Ky. March 21, 1980). Finally, the most restrictive judicial interpretation of the Bill of Rights has been that of three dissenting judges on the Third Circuit, who would have held in *Halderman* that the Bill of Rights should be interpreted only as a statement of general findings and declarations and should not "be used as a charter for the creation of absolute obligations ...." 612 F.2d at 119 (dissenting opinion of Seitz, C. J.).

The Bill of Rights begins with the statement that "Congress makes the following findings ...." 42 U.S.C.S. § 6010. The remainder of the Bill of Rights is not written as a statement of factual findings, however, but as a declaration of individual rights and government responsibilities. In fact, the Act contains a separate statement of congressional findings and purpose that itself applies to the Bill of Rights section. *Id.* § 6000 (Cum.Supp.1980). Congress itself recognized the status of the rights enumerated in section 6010 in a 1978 amendment which states that "The rights of persons with developmental disabilities described in findings made in this section are in addition to any constitutional or other rights otherwise afforded to all persons." *Id.* § 6010 (Cum.Supp.1980).

The mandatory language of section 6010 makes plain Congress' intention to establish a right to appropriate care and a right to treatment that maximizes developmental potential in the environment least restrictive of personal liberty. The only precedent supporting the view that the Bill of Rights is unenforceable is the *Halderman* dissent. I am not convinced that Congress intended its enactment to be merely precatory.

### 1. *The Two Rights*

The court is not aware of any prior case that has considered the interrelationship of the two rights protected by the Bill of Rights as they would operate in a case like Lynch's. The cases discussed above, which recognize rights protected by the Act, arose

in different situations and provide only general guidance. The defendant's argument that institutionalization is required because it is the only appropriate medical care for Lynch and is on that account alone the type of care least restrictive of his liberty applies the Bill of Rights so as to subordinate the liberty interest to the right to appropriate care. The defendant's argument rests on an assumption that the two rights protected are in conflict. But the Act purports to establish two independent rights—one to appropriate care and the other to liberty—that each should be implemented. The distinction between them is clear. One delineates the goal of the programs; the other, how the game should be played.

#### a. *Right to Appropriate Treatment*

Congress established a right to appropriate treatment in response to the problem of "warehousing" the handicapped and retarded. Appropriate care is not only custodial, but provides for treatment, rehabilitation and development. *See Halderman*, 612 F.2d at 95–97 & 95 n.14; *Naughton*, 458 F.Supp. at 614–15. The primary focus of subsection (1) of the Bill of Rights (appropriate care) is the nature and purpose of care. Thus, the *Naughton* court suggested that medical malpractice, "an isolated incident of negligent treatment, addressing the quality of care toward that individual, is not within the statute's concern." *Id.* at 615. Similarly, whether the medical care provided is as extensive or as technologically advanced as possible does not alone determine whether it is "appropriate" under section 6010(1), although these would be relevant factors in specific cases. Whether home care, institutionalization, or, perhaps, both are appropriate for Lynch depends on whether they advance the goals of rehabilitation and treatment.

#### b. *Right to the Least Restrictive Treatment*

■ At the same time Congress enacted a right to treatment, Congress also provided, in the same Act, that the treatment be least restrictive of personal liberty (subsection (2)). This was in response to the scandals arising from inhumane conditions at

several large institutions. *See Halderman,* 612 F.2d 103–07 (reviewing legislative history). A principal purpose of subsection (2) was to avoid inappropriate placements in such institutions. *See id.* at 104–05 (quoting remarks of Representative Carter). Although Lynch is not threatened with placement in Connecticut Valley Hospital or Mansfield Training School, his liberty, which would be restricted in any institution, is nevertheless protected by the Act. In other contexts, the right to liberty has been recognized as including the right to exercise fundamental life choices, even to the detriment of one's own health. Thus a state may not impose medical treatment on a patient who rejects it on religious grounds in the absence of a finding of incompetency or a substantial third party interest. *Winters v. Miller,* 446 F.2d 65, 68–71 (2d Cir.), *cert. denied sub nom. Thomas v. Winters,* 404 U.S. 985, 92 S.Ct. 450, 30 L.Ed.2d 369 (1971); *see Holmes v. Silver Cross Hospital,* 340 F.Supp. 125, 129–30 (N.D.Ill.1972). The right to privacy may also include a right to refuse treatment. *In the Matter of Karen Quinlan,* 70 N.J. 10, 37–40, 355 A.2d 647, 662–63, *cert. denied sub nom. Garger v. New Jersey,* 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). *See generally* Annot., *Patients' Right to Refuse Treatment,* 93 A.L.R.3d 67, 72–77. The liberty interest protected by the Developmentally Disabled Bill of Rights should be recognized as preserving the right of a patient to decide to forgo the additional medical advantages of institutionalization for the benefits of a less restrictive home environment in which some appropriate care is also available. An Act purporting to protect personal liberty should not be construed as forcing a recipient of an entitlement to choose between sacrificing either his entitlement or his liberty.[11]

### 2. Enforcement of the Bill of Rights

It is evident from the language of the Developmentally Disabled Bill of Rights that Congress intended to act to the full extent of its power to require states to afford developmentally disabled people the rights to both appropriate treatment and liberty. The Act's statement of "Findings and Purpose" establishes that Congress intended to "strengthen ... programs that reduce or eliminate the need for institutional care," 42 U.S.C.S. § 6000(a)(5) (Cum. Supp.1980), by making "grants to support a system in each State to protect the legal rights of all persons with developmental disabilities." *Id.* § 6000(b)(2)(E) (Cum. Supp.1980).

Congress' decision to aid state enforcement of the rights established by the Bill of Rights by providing grants in aid does not suggest an intention to limit enforcement of those rights to programs so funded. The Bill of Rights does not carry any such limitation on its face and, in subsection (3), which prohibits funding of inadequate residential programs, refers to federal spending in general. It would be inappropriate to infer a bar to the application of the two rights from the separate enforcement provisions of the Developmentally Disabled Assistance Act. *Cf. Doe v. Colautti,* 592 F.2d 704, 707–08 (3d Cir. 1979) (court applies Rehabilitation Act's prohibition of discrimination against the handicapped in any federally funded program, 29 U.S.C. § 794 (Cum.Supp.1980), to a program funded by the Medicaid Act). Congress' attempt to enforce the rights by the Assistance Act is likewise not a bar to private enforcement of the rights.[12] A statute establishing a grant program and restricting payment in a manner designed to protect

---

11. The Act conceivably could be read as allowing some limit on the rights to appropriate care and to liberty to account for the limitations of a state's resources. *See Halderman,* 612 F.2d at 118–19 (dissenting opinion). That issue may be irrelevant in the present case, however. At the preliminary injunction hearing, the state did not claim that it had any financial interest *in paying for institutionalization rather than for* at least eight hours of home care a day.

12. Because federal statutory rights may be enforced against state governments by section 1983 actions, *Maine v. Thiboutot,* 48 U.S.L.W. 4859, 4860–61 (U.S.1980), it is not clear that the court must determine that a statute itself provides a private cause of action in the case of a suit against the state.

specified individual rights is often interpreted as implicitly authorizing a private cause of action to enforce those rights. Thus, in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Supreme Court held that a statutory ban of discrimination in education programs receiving federal financial assistance could be enforced privately even though Congress had established cut-off of funds as an express means of enforcement. *Id.* at 703–08. Three courts have held that the Developmentally Disabled Bill of Rights is enforceable by a private cause of action, *Halderman*, 612 F.2d at 97–100; *Henkin*, 498 F.Supp. at 665 (Lexis pages 14–16); *Naughton*, 458 F.Supp. at 616–17. *But cf. United States v. Solomon*, 563 F.2d 1121, 1125 (4th Cir. 1977) (judicial remedy available only in state court). The analysis by these courts is convincing, and the defendant has not argued against the private enforcement of any rights the Bill of Rights may establish.[13]

■ The court concludes that whether Lynch is entitled to home care is a fair ground for litigation. In addition to the legal issues discussed above, the affidavit of Dr. Pierro states that institutionalization would cause psychological damage to Lynch and the affidavit of Dr. Arnold states that

institutionalization of Lynch is medically unnecessary. Although the defendant's evidence may tend to prove that, from the perspective of a doctor considering only the goal of health risk minimization, institutionalization may be the best possible care, the testimony does not establish that home care is necessarily inappropriate and not a valid option open to the plaintiff in light of his protected liberty interest.

### C. *Section 504*

As another string to its bow, the plaintiff claims that the defendant's denial of home care payments under its Medicaid program is illegal discrimination against the handicapped. Section 504 of the Rehabilitation Act of 1973 provides that "No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C.S. § 794 (Cum.Supp.1980). Lynch claims to have been discriminated against in the operation of the Medicaid program[14] because the defendant decided to disallow a benefit otherwise available—home care payments—only because the plaintiff is a quadriplegic who lives alone.[15] As such, he

---

13. The Third Circuit noted in *Halderman* that its decision that the Bill of Rights implies a private cause of action did not reach the issue of whether a congressional action under the spending power "could ever provide the predicate for private substantive rights." 612 F.2d at 98. The *Halderman* court, relying on an alleged right of institutionalized patients to receive treatment, had held that the Bill of Rights was a proper exercise of congressional power to enforce the fourteenth amendment. *Id.* at 98 & n.17. But, even if the Act cannot extend to Lynch under congressional power to enforce the fourteenth amendment, it is clearly within the congressional spending power to require that states receiving funds under 42 U.S.C.S. § 1396a (Medicaid) spend them in accordance with the requirement of 42 U.S.C. § 6010 (Bill of Rights). *See generally, Fullilove v. Klutznick*, —— U.S. ——, ——, ——, 100 S.Ct. 2758, 2772–73, 65 L.Ed.2d 902 (U.S.1980) (plurality opinion); *King v. Smith*, 392 U.S. 309, 316–17, 88 S.Ct. 2128, 2132–33, 20 L.Ed.2d 1118 (1968). Although a construction of the Developmentally Disabled Bill of Rights requiring state provision of medical services to meet certain stan-

dards whether or not the state programs were funded federally might present a tenth amendment issue, *see National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the perquisites of state sovereignty are not a relevant consideration in the conduct of the federally funded medicaid program. And, I cannot find that congressional intent to provide a private cause of action did not also extend to plaintiffs in Lynch's position: those trying to avoid rather than escape inappropriate institutionalization. *Cf. Henkin v. South Dakota Dept. of Social Services*, 498 F.Supp. 659 (D.S.D.1980) (present institutionalization not a requirement for maintaining a private cause of action under the Developmentally Disabled Bill of Rights).

14. Section 504, by its own terms, applies to "any federal program" and has been applied to state Medicaid programs. *See Doe v. Colautti*, 592 F.2d 707–10 (3d Cir. 1979).

15. The defendant's witnesses stated at trial that although other quadriplegics are able to remain at home, and are eligible for home care,

is a handicapped person [16] and that is not disputed.

The Second Circuit has recognized a private cause of action to enforce section 504. *See Kampmeier v. Nyquist,* 553 F.2d 296, 299 (2d Cir. 1977) (on denial of motion for preliminary injunction); *accord Camenisch v. University of Texas,* 616 F.2d 127, 130–32 (5th Cir.), *cert. granted,* —— U.S. ——, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980).[17] The defendant argues, however, that Lynch's claim must fail because Lynch's handicap itself precludes him from participation in the home care program, apparently on the theory that home care is completely unsuitable for a quadriplegic in his circumstances and substantial modification in the program would be required in order to accommodate him.

■ The section 504 bar against discrimination requires that the state have a "substantial justification" for not accommodating Lynch in the program of his choice before his handicap may be used as the basis of his exclusion. *Kampmeier v. Nyquist,* 553 F.2d at 299. If a handicapped person would be unable to participate in a program in spite of his handicap without extensive modification to the program, the law does not require his inclusion.

In *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court held that section 504 did not prohibit a nurse training program from rejecting an applicant solely because of a hearing disability. *Id.* at 405–13, 99 S.Ct. at 2366–70. A program may require applicants to possess physical qualifications necessary for participation in the program, *id.* at 406–10, 99 S.Ct. at 2367–69, and the statute does not require affirmative action to accommodate

individuals who do not possess such qualifications, *id.* at 407–13, 99 S.Ct. at 2367–70. In the case of a clinical nursing program, safety requires that nurses hear their patients. *Id.* at 407, 99 S.Ct. at 2367. The only modification in the program that could have accommodated the plaintiff would have required a radical change in the program's goal of training nurses capable of caring for patients without supervision. *See id.* at 413, 99 S.Ct. at 2370.

Similarly, in *Doe v. Colautti,* 592 F.2d 704 (3d Cir. 1979), the Third Circuit held that section 504 did not require the state to extend the same medical benefits to the mentally ill as to the physically ill. *Id.* at 708–10. The antidiscrimination provision forbids the exclusion of a mentally ill person who also has a physical ailment from treatment in a program for the physically ill only because of the patient's mental problem, but does not require expansion of the program to treat the mental problem as well. *See id.* at 708–09.

Finally, a handicap may disqualify a person from participating in a program because the state has a special interest in protecting the disabled against physical harm. Thus, in *Kampmeier v. Nyquist,* 553 F.2d 296 (2d Cir. 1977), the Second Circuit affirmed a denial of a preliminary injunction for failure to demonstrate likelihood of success on the merits when a school refused to allow children with only one eye to participate in contact sports. *Id.* at 299–300. The court noted that "the defendants have relied on medical opinion that children with sight in only one eye are not qualified to play in contact sports because of the high risk of eye injury. The plaintiffs have presented little evidence—medical, statistical, or otherwise—which would cast doubt

Lynch is not because he lives alone. Lynch's handicap, therefore, was not the sole basis of the defendant's decision to refuse home care authorization. It is nevertheless obvious that it is the severity of Lynch's condition—his handicap—that prevents him from being suitable for home care in the eyes of the defendant. The defendant does not argue that all individuals who live alone should be institutionalized, but only that quadriplegics who live alone should be institutionalized.

**16.** The definition of handicapped person for purposes of section 504 is "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities ...." 29 U.S.C.S. § 706(7)(B) (Cum.Supp.1980).

**17.** The Supreme Court has noted that it has not ruled on this issue. *Southeastern Community College v. Davis,* 442 U.S. 397, 404–05 n.5, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979).

on the substantiality of this rationale." *Id.* at 299.

That participation in a program may involve some risk to a handicapped person, or that some minimal modification must be made to include him, do not, however, necessarily establish a substantial justification for barring him from a program. In *Kampmeier*, for example, the court noted that the state may not be able to justify excluding a one-eyed student from contact sports if he were "old enough to weigh the risks and make the decision for himself." *Id.* at 300 n.9. And in *Southeastern*, the Supreme Court stated that some failure of accommodation, not requiring "undue financial and administrative burdens upon a State," might be illegal under section 504. *Id.* at 412–13. Thus, the Fifth Circuit has held that despite the *Southeastern* decision, section 504 may require a university to provide an interpreter for a deaf student in an academic program. *Camenisch v. University of Texas*, 616 F.2d 127, 132–33 (5th Cir.) (affirming issuance of preliminary injunction), *cert. granted*, —— U.S. ——, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980). The court stated:

> The Supreme Court's decision in *Southeastern Community College* says only that Section 504 does not require a school to provide services to a handicapped individual for a program for which the individual's handicap precludes him from ever realizing the principal benefits of the training.... [I]n this case, Camenisch's claim can succeed on the merits, despite the holding in *Southeastern Community College*, since he can obviously perform well in his profession.

*Id.* at 133 (footnote omitted).

■ The state has claimed that Lynch need not be given home health care assistance because it would not provide him with sufficient medical attention. This does not appear to be a case like *Southeastern*, however, because providing Lynch with home care service would not require changing the purpose or goal of the program. Unlike the deaf plaintiff in *Southeastern*, who could derive no substantial benefit from nursing school because she could not hope to ever become a nurse, Lynch would be benefited by receiving home medical care. Unlike the mentally ill plaintiff in *Colautti*, seeking the benefits of a program for the physically ill, Lynch is not seeking any services from home care that it does not already provide. He asks only for services that are already provided to others. And, unlike the school officials in *Kampmeier*, the defendant here has no substantial *parens patriae* interest that requires substituting its own judgment for Lynch's of whether he should suffer the risks home care entails. Even if Lynch is unable to find an agency willing to provide more than eight hours of care a day, the state does not have a substantial interest in denying him reimbursement for eight hours of care a day only to induce him to enter an institution.

The only modification to the program that may be necessary to accommodate Lynch is financial, that is, to pay the cost of home care to a private agency authorized to provide it. The state has previously paid, however, for eight hours of care a day and relied, at the preliminary injunction hearing, on paternal, not financial, reasons for refusing such payments in the future. The defendant did not introduce evidence that providing more than eight hours of care, if that were necessary to accommodate Lynch, would have a demonstrably burdensome effect. To the extent that the defendant relies on Lynch's handicap in denying him benefits under the Medicaid program, section 504 of the Rehabilitation Act of 1973, 29 U.S.C.S. § 794 (Cum.Supp.1980) provides an alternative basis for granting the plaintiff's motion for a preliminary injunction.

The court concludes that whether the state has, in fact, a substantial justification for denying Lynch home care benefits is a fair question for litigation.

### Summary

The defendant's motion for dismissal of counts one and two is granted. The defendant's motions for dismissal and summary judgment are otherwise denied.

The plaintiff's motion for a preliminary injunction is granted. Pending final resolution on the merits, the terms of this court's

previous temporary restraining order of December 6, 1979, enjoining the defendant from refusing to authorize the plaintiff's receipt of less than 56 hours of home health care services a week, shall be continued.

SO ORDERED.